# In the United States Court of Federal Claims

No. [deleted]

(Filed November 22, 2010) <u>*/</u>

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | * | Takings; inverse condemnation |
| | * | claim; military takings claim; |
| **[JOHN DOE]**, | * | breach of contract; motion to |
| | * | dismiss pursuant to RCFC |
| Plaintiff, | * | 12(b)(1), (6); Tucker Act, 28 |
| | * | U.S.C. §1491(a)(1) (2006); |
| v. | * | jurisdiction; justiciability; enemy |
| | * | property doctrine; military |
| **THE UNITED STATES**, | * | necessity doctrine involving |
| | * | Operation Iraqi Freedom; |
| Defendant. | * | standing; substantial connections |
| | * | to the United States by Iraqi |
| * * * * * * * * * * * * * * * * * * * * | * | nonresident alien for takings |

claim of extraterritorial property;
claim for inverse condemnation;
<u>Totten</u> bar (<u>Totten v. United
States</u>, 92 U.S. 105 (1875));
elements of express contract and
implied-in-fact contract.

<u>Michael A. Pullara</u>, Houston, TX, for plaintiff.

<u>Christopher A. Bowen</u>, Washington, DC, with whom was <u>Assistant Attorney General
Tony West</u>, for defendant.  <u>Samuel W. Morris</u> and <u>Lisa M. Satterfield</u>, Department of the
Army, Arlington, VA, of counsel.

## MEMORANDUM OPINION AND ORDER

<u>MILLER</u>, Judge.

---

<u>*/</u>  This opinion originally was filed under seal on October 28, 2010.  The parties were
requested to notify the court of any proposed redactions.  Other than changing plaintiff's
name to John Doe, plaintiff did not request any redactions.  Defendant requested redactions
and substitutions, not all of which are internally consistent or otherwise reasonable.  The
material in brackets with the word "[deleted]" reflects defendant's redactions that have been
implemented by the court.

Plaintiff's claim for damages from an alleged taking of his property and for breach of contract is before the court after argument and supplemental briefing on defendant's motion to dismiss under RCFC 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, under RCFC 12(b)(6), for failure to state a claim for relief.  A novel takings issue is presented—whether an Iraqi citizen can maintain a Fifth Amendment takings claim for the occupation of his home by the United States military during the Battle of Fallujah, a question that requires a determination as to whether the military necessity doctrine precludes invocation of the Fifth Amendment for a military occupation during wartime and, if not, whether plaintiff can establish the requisite substantial connections with the United States, a prerequisite for a nonresident alien to have standing to allege a taking of extraterritorial property; and, if so, whether plaintiff can bring a claim for inverse condemnation.  The contract claim requires resolution of the more straightforward issue of whether plaintiff has alleged the elements necessary to show an express or implied contract with the United States.

**FACTS**

I. <u>Background</u>

1. <u>The Battle of Fallujah</u>

The following facts reflect documents submitted beyond the original and amended complaints because subject matter jurisdiction is disputed.  These facts, material solely to defendant's motion to dismiss on the merits, are accepted as alleged or averred.  This case has its genesis in the United States' military actions in Operation Iraqi Freedom.  On March 19, 2003, President George W. Bush ordered, as part of a multinational force (the "Coalition" or "Coalition Forces"), the commencement of combat operations in Iraq.  <u>See</u> Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, § 3(a), 116 Stat. 1498 (granting congressional authorization for President to use armed forces in Iraq); Letter to Congressional Leaders Reporting on the Commencement of Military Operations Against Iraq, 1 Pub. Papers 287 (Mar. 21, 2003).  In April 2003 Coalition Forces took control of Baghdad, Iraq's capital, and the existing government controlled by Saddam Hussein came to an end.  By spring 2004 United States and other Coalition Forces were engaged in combat operations against an increasingly violent insurgency.

During March 2004 violent attacks against Coalition Forces in Fallujah "rose sharply," and the city began to fall into the hands of insurgents.  Declaration of Lt. Col. Gregory G. Gillette USMC, Feb. 4, 2009, ¶ 6.  On March 31, 2004, an American contractor's vehicle was ambushed by insurgents; all four passengers were killed; their bodies, mutilated.  <u>Id.</u>  In April 2004 Coalition Forces launched an offensive against the insurgency to regain control of the city (the "First Battle of Fallujah").  In the ensuing days of the fight, Coalition Forces were

combating dozens of dispersed hardcore groups of insurgents located throughout the entire city and surrounding area. Insurgents took over businesses, public buildings and occupied private homes, using them to build or store improvised explosive devises and ammunition. In anticipation and prosecution of the battle, insurgents occupied many homes and rigged them with booby traps to kill coalition forces during house to house fighting. Insurgents routinely destroyed homes and used the rubble to impede the flow of Coalition Force vehicles and also used the rubble to fortify their fighting positions.

Id. ¶ 7. Due to "military necessity," Coalition Forces would temporarily occupy buildings in and around the city. Id. ¶ 8. The fighting continued in and around Fallujah through November and December of 2004 (the "Second Battle of Fallujah"). See Declaration of Lt. Col. Keith A. Forkin USMC, Feb. 4, 2010, ¶ 6. The violence decreased, and combat operations in Fallujah began to stabilize in early 2005. Id.

## 2. The occupation of plaintiff's home

[John Doe] ("plaintiff"), an Iraqi citizen, professes to be a sheik and a man of considerable education and influence. In May 2004 plaintiff owned and resided in his home in Fallujah, Iraq. Plaintiff alleges that, at some point prior to the commencement of Operation Iraqi Freedom, he was contacted by "authorized representatives of the United States," who asked him to "provide assistance in support of [the United States'] mission in Iraq." Am. Compl. filed Nov. 16, 2009, ¶ 4. Plaintiff maintains that these representatives were members of the United States [deleted] who conducted "many secret conversations and meetings" with plaintiff. Pl.'s Br. filed June 21, 2010, at 2. 1/ In exchange for plaintiff's

_____

1/ On September 23, 2010, plaintiff filed a motion for leave to file an affidavit supplementing his response to defendant's motion to dismiss plaintiff's amended complaint. See Pl.'s Br. filed Sept. 23, 2010, ¶ 2. Plaintiff's supplemental affidavit attests that the facts asserted in his response to defendant's motion to dismiss are within his personal knowledge and are true and correct. See Affidavit of [John Doe], Sept. 21, 2010, ¶ 2. By order entered on September 27, 2010, the court expedited briefing, and defendant filed its opposition on September 29, 2010. By order entered on September 30, 2010, the court granted plaintiff's motion "only insofar as the affidavit relates to the facts pleaded in ¶¶ 4, 6, and 13 of Plaintiff's First Amended Complaint." Order entered Sept. 30, 2010, at 2. The court explained its reasoning, as follows:

   The facts to which Mr. [Doe] attests are those put in issue by footnote 4 and pages 19-20 of defendant's reply brief filed on July 12, 2010. These were the facts discussed by counsel and the court during argument. See

"support and assistance," these representatives agreed that the United States would compensate him for any "inconvenience or damage he sustained in the forthcoming military action." Am. Compl. ¶ 4. Plaintiff accepted this offer and provided support to the "interests of the United States in Iraq." Id.

On May 8, 2004, members of the United States Marine Corps (the "USMC" or "Coalition Forces"), acting in support of Coalition operations, temporarily occupied plaintiff's home and associated property ("plaintiff's property") after issuing a written Memorandum of Record dated May 8, 2004, and signed by then-Major Gregory G. Gillette ("the Gillette Memorandum"). Id. ¶ 5. The Memorandum provided notice of intent to occupy plaintiff's home and stated in full:

> Be advised that the Coalition Forces are occupying your house and property without your consent. The Coalition Forces are in your home due to military necessity. We intend to be fair and to compensate you for any damages and inconvenience caused by our occupation. However, you cannot object to the Coalition presence.

Id. Ex. 2. Plaintiff and his family complied with the Gillette Memorandum, departed from the house, and took up residence elsewhere. See id. ¶ 5. During the occupation of plaintiff's property, Coalition Forces razed a wall surrounding plaintiff's home. Id. ¶ 7. "The reason given for such destruction was military necessity (i.e., to diminish the probability of insurgents using the wall as cover to fire on Coalition Forces)." Id. Plaintiff maintains that Coalition Forces occupied his property continuously until October, 2004, at which time they vacated the property without notice. Id. ¶ 8. At or near the time Coalition Forces withdrew, the property was attacked, looted, and destroyed by unknown persons. Id. ¶ 9.

---

1/ (Cont'd from page 3.)

Transcript of Proceedings, [Doe] v. United States, No. [deleted], at 27-28, 30, 69-70, 80, 83-84, 90-92 (Fed. Cl. Sept. 2, 2010).

. . . .

However, although defendant's objections are well taken, the court deems it in the interests of full and fair consideration of the amended complaint that plaintiff's factual assertions concerning contacts between the [deleted] and him are considered in opposition to defendant's motion to dismiss.

Id. at 1.

Plaintiff alleges that the conduct of Coalition Forces constitutes a "taking of property without either due process or fair compensation and a breach of the express or implied-in-fact contract made by and between the United States and Plaintiff." Id.

Plaintiff brought a claim for damages before the Foreign Claims Commission of the USMC Multi National Forces – West for Iraq's Al Anbar Province (the "Commission"). Pl.'s Br. filed June 21, 2010, Ex. 2.  In a letter dated September 4, 2007, a representative of the Commission, Lt. Col. A. G. Peterson, informed plaintiff that he was directed by Brigadier General John R. Allen to "thoroughly investigate[] and appropriately consider[]" plaintiff's claim "under the Foreign Claims Act," 10 U.S.C. § 2734 (2006). Id.  The Commission investigated plaintiff's claim, interviewing plaintiff, his neighbors, and the unit that occupied his home. Id.  Lt. Col. Peterson's letter communicated the result of the Commission's investigation, as follows:

> The destruction of your home and associated property is not in dispute.  But after reviewing the materials submitted in support of your claim, the panel considering your claim determined that the evidence you provided fails to support a claim against the U.S. government for the amount you submitted.
>
> Specifically, the panel concluded that, other than the damage to the fence, there is no evidence that: a) U.S. forces destroyed your home and associated property; or, b) U.S. forces negligently abandoned your home, resulting in its destruction and the destruction of associated property.  The panel approved a payment for $6,500 ($5,000 to compensate you for your damaged fence and $1,500 to compensate you for the three days in May of 2004 that U.S. forces occupied your property).  I have directed that this amount be paid promptly by my representative.

Id.  Plaintiff declined the offer and filed suit in the United States Court of Federal Claims.

3. Procedural history

Plaintiff's initial complaint filed on September 24, 2008, sought $6 million in damages sustained because of the expropriation of his property by Coalition Forces.  On February 17, 2009, defendant moved to dismiss pursuant to RCFC 12(b)(1) and RCFC 12(b)(6).  Plaintiff responded on September 30, 2009, and on November 16, 2009, filed Plaintiff's First Amended Complaint.  This action mooted the pending motion. See RCFC 15(a)(1)(B).  On February 5, 2010, defendant again moved to dismiss pursuant to RCFC 12(b)(1) and RCFC 12(b)(6), to which plaintiff responded on June 21, 2010, and defendant replied on July 12, 2010.  Following oral argument on September 2, 2010, the court entered an order on September 16, 2010, requesting supplemental briefing on the precedential impact

of Tenet v. Doe, 544 U.S. 1 (2005), and Totten v. United States, 92 U.S. 105 (1875), on this court's subject matter jurisdiction.  See infra note 27.

Plaintiff alleges an inverse condemnation claim against the United States.  Am. Compl. ¶ 12.  The destruction of plaintiff's property was the "direct, natural or probable result" of defendant's intentional occupation of plaintiff's home and destruction of his security wall.  Id.  Because the destruction of the home was reasonably foreseeable once the security wall was destroyed, plaintiff reasons, defendant caused the destruction of his home.  "Further, the invasion of the protected property interest appropriated a benefit to the United States at the  expense of Plaintiff, at least by preempting the Plaintiff's right to enjoy his property for an extended period of time . . . ."  Id.

In his amended complaint and response to defendant's renewed motion to dismiss, plaintiff advances a novel theory to show that he possesses standing to bring a takings claim.  Plaintiff asserts that "at the time of the alleged taking the Government of Iraq had ceased to exist as a sovereign entity."  Id. ¶ 10.  Iraqi sovereignty instead was vested in the United States of America through the exercise of sovereign authority "within the territory of Iraq" by the Coalition Provisional Authority (the "CPA"), "a subsidiary entity of the United States Department of Defense."  Id.  Because fundamental constitutional rights, including the U.S. Constitution's Fifth Amendment's just compensation clause, are "guaranteed to inhabitants of those territories that are not destined for statehood but in which the United States exercises sovereign power," i.e., unincorporated territories of the United States, plaintiff has standing to bring a takings claim.  Id.  Further, plaintiff alleges a substantial connection with the United States because of the "unique relationship" created between the United States and Iraq when the "United States (acting pursuant to United Nations mandate) voluntarily created a relationship with the people of Iraq that exceeded in both nature and degree the relationship normally taken with a 'foreign' country."  Id. ¶ 11.

Plaintiff also alleges breach of an express or an implied-in-fact contract based on plaintiff's agreement with an "authorized representative of the United States" that, in exchange for his support of United States military action in Iraq, the United States would compensate plaintiff for any inconvenience or damage sustained during such military action.  Id. ¶ 13.

Defendant challenges plaintiff's claims on four grounds.  First, the Court of Federal Claims lacks jurisdiction to entertain this controversy because losses that occur in combat zones during military conflicts are not justiciable.  Second, plaintiff cannot demonstrate the requisite connections to the United States that are necessary for a nonresident alien to bring an extraterritorial takings claim.  Defendant disputes the allegation in plaintiff's amended complaint that the United States was a sovereign power in Iraq at the time of the alleged taking and asserts that United Nations ("UN") resolutions do not impose a specific trust

relationship upon the United States.  Third, the amended complaint fails to state a viable claim for inverse condemnation because the insurgents were the actual causative agents of the loss of plaintiff's home, the destruction of which plaintiff has failed to demonstrate benefitted the United States.  Finally, because plaintiff cannot show mutual intent to contract or establish consideration, plaintiff has "failed to sufficiently allege the required elements of either an express or an implied-in-fact contract with the United States with respect to his house."  Def.'s Br. filed Feb. 5, 2010, at 4.  The court considers each of these grounds for dismissal in turn.

## DISCUSSION

### I. Standards of review

#### 1. Subject matter jurisdiction pursuant to RCFC 12(b)(1)

Jurisdiction must be established before the court may proceed to the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998).  Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction.  Renne v. Geary, 501 U.S. 312, 316 (1991); DaimlerChrysler Corp. v. United States, 442 F.3d 1313, 1318 (Fed. Cir. 2006) ("[I]t is settled that a party invoking federal court jurisdiction must, in the initial pleading, allege sufficient facts to establish the court's jurisdiction.").  Jurisdiction must be established independently for each cause of action. DaimlerChrysler, 442 F.3d at 1318-19.  Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); accord M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

When the movant challenges jurisdiction pursuant to RCFC 12(b)(1) upon the facial sufficiency of the pleadings, the court will accept as true a plaintiff's undisputed allegations of fact, Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Reynolds, 846 F.2d at 747, and indulge "all reasonable inferences" in favor of the non-movant, Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (holding courts are obligated "to draw all reasonable inferences in plaintiff's favor").  Nevertheless, when the RCFC 12(b)(1) motion controverts the plaintiff's jurisdictional allegations and challenges the factual basis of the court's jurisdiction, only unchallenged facts are deemed to be correct and true, Hamlet v. United States, 873 F.2d 1414, 1416 (Fed. Cir. 1989), and the plaintiff cannot rely merely on allegations in the complaint, but instead must bring forth relevant competent proof to establish jurisdiction, McNutt v. Gen. Motors

Acceptance Corp., 298 U.S. 178, 189 (1936); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

In deciding a RCFC 12(b)(1) motion under these circumstances, the court may conduct fact-finding, Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999), and may consider "evidentiary matters outside the pleadings," Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985); accord Cedars-Sinai Med. Ctr., 11 F.3d at 1584 (permitting review of "evidence extrinsic to the pleadings, including affidavits and deposition testimony"); see also Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991) ("In determining whether a motion to dismiss [for lack of subject matter jurisdiction] should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed."); Reynolds, 846 F.2d at 747 ("If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the . . . court may consider relevant evidence in order to resolve the factual dispute."). Thus, in the case at bar, the parties are authorized to introduce, and this court is authorized to examine, evidence beyond the pleadings in order to resolve the disputed jurisdictional facts.

2. Failure to state a claim pursuant to RCFC 12(b)(6)

Defendant also moves pursuant to RCFC 12(b)(6) to dismiss the first amended complaint for failure to state a claim upon which relief can be granted. "The purpose of [RCFC 12(b)(6)] . . . is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail." Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326-27 (1989). The court's task in considering a motion to dismiss for failure to state a claim is not to determine whether a plaintiff will ultimately prevail, but "'whether the claimant is entitled to offer evidence to support the claims.'" Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer, 416 U.S. at 236). "A dismissal for failure to state a claim . . . is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief." Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995).

In deciding a RCFC 12(b)(6) motion, the court must assess whether the amended complaint adequately states a claim and whether plaintiff can make "allegations plausibly suggesting (not merely consistent with)" a showing of entitlement to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (rephrasing Twombly standard as stating "a claim to relief that is plausible on its face"); accord Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009); McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356-57 (Fed. Cir. 2007). Although a plaintiff's factual allegations need not be "detailed," they "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are

8

true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (emphasis omitted) (citation omitted). "At the same time, a court is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" Acceptance Ins. Cos. v. United States, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting Twombly, 550 U.S. at 555). The court thus "'accept[s] as true all factual allegations in the complaint, and . . . indulge[s] all reasonable inferences in favor of the non-movant'" to evaluate whether plaintiffs have stated a claim upon which relief can be granted. Chapman Law Firm, 490 F.3d at 938 (quoting Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (omission in original)).

## II. Plaintiff's takings claim

### 1. Takings claim cognizable under the Fifth Amendment

The Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Court of Federal Claims has jurisdiction over claims brought against the United States alleging a taking in violation of the Fifth Amendment. See 28 U.S.C. § 1491(a)(1) (2006) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution . . . ."). Physical takings occur "'when the government encroaches upon or occupies private land for its own proposed use.'" Goodrich v. United States, 63 Fed. Cl. 477, 480 (2005) (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001)). The standard for determining whether a Fifth Amendment taking has occurred, as articulated in Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363 (Fed. Cir. 2004), follows:

> First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment. "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end.
>
> Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.

Id. at 1372 (citations omitted).

Defendant accepts the assertion of plaintiff's property interest, but disputes this court's jurisdiction on grounds that "property damage claims arising from military acts during a conflict" are nonjusticiable military acts. Def.'s Br. filed Feb. 5, 2010, at 5 (citing

El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1355 (Fed. Cir. 2004)); see also id. at 7.  Defendant also argues that plaintiff's claims are nonjusticiable on the ground that, plaintiff's cooperation with Coalition Forces notwithstanding, his property was "enemy property" at the time of the occupation and therefore is not subject to the Fifth Amendment. Id. at 10-11.

Not all takings claims are cognizable under the Fifth Amendment.  In the case of enemy property destroyed by the military, the enemy property doctrine provides that the "United States does not have to answer under the Takings Clause for the destruction of enemy property or . . . 'enemy war-making instrumentalities.'" El-Shifa, 378 F.3d at 1355 (citation omitted); see also Perrin v. United States, 4 Ct. Cl. 543, 547-48 (1868) ("No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy . . . ."), aff'd, 79 U.S. 315, 316 (1870).

More broadly, the United States Supreme Court counsels that, for losses that occur in wartime or during periods of armed conflict, "many losses must be attributed solely to the fortunes of war, not to the sovereign." United States v. Caltex (Phil.), Inc., 344 U.S. 149, 155-56 (1952) (takings claim not cognizable for oil facilities destroyed by U.S. forces in face of Japanese advance upon Manila); see also Nat'l Bd. of YMCAs v. United States, 396 F.2d 467, 470 (Ct. Cl. 1968) ("It is axiomatic that the fifth amendment is not suspended in wartime, but it is equally well recognized that a destruction of private property in battle or by enemy forces is not compensable.").  This is because the "terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war." Caltex (Phil.), 344 U.S. at 155.  Thus, under the military necessity doctrine, "civilian property destroyed or expropriated because of the exigencies of military action, falls outside the Fifth Amendment." El-Shifa Pharm. Indus. Co. v. United States, 55 Fed. Cl. 751, 765 (2003) (holding that takings clause "does not apply to the destruction of property during combat operations"), aff'd, 378 F.3d 1346 (Fed. Cir. 2004); see also Franco-Italian Packing Co. v. United States, 128 F. Supp. 408, 413 (Ct. Cl. 1955) ("The exercise of defendant's regulatory and police powers, war powers or emergency powers in cases of imminent peril to the general welfare [does] not fall within the fifth amendment limitation, although taking of private property often result[s].").

However, not all military conduct is shielded from the takings clause's reach.  Indeed, the United States Court of Appeals for the Federal Circuit cautions that the Government may not avoid liability under the takings clause "by simply using its military forces as cover for activities that would otherwise be actionable if performed by one of its civilian agencies. Military conduct that does not touch on the destruction or appropriation of enemy property can sometimes give rise to a valid takings claim." El-Shifa, 378 F.3d at 1356 (citing Argent v. United States, 124 F.3d 1277, 1281-85 (Fed. Cir. 1997) (domestic military aircraft

overflights constitute compensable takings claim)).  Thus, military conduct can give rise to a compensable takings claim when the military has exercised the Government's civil eminent domain authority.  Id.

In determining whether a military takings claim is compensable under the Fifth Amendment, "[n]o rigid rules can be laid down to distinguish compensable losses from noncompensable losses.  Each case must be judged on its own facts."  Caltex (Phil.), 344 U.S. at 156.  The enemy property doctrine tasks the court with "ascertain[ing] the precise point at which the military conduct complained of is no longer coextensive with the state's civil power of eminent domain, but rather, enters the zone of conduct, outside the reach of the Takings Clause, where the United States appropriates the property of its enemies."  El-Shifa, 378 F.3d at 1356.  Similarly, when considering the claim through the lens of the military necessity doctrine, the court is guided by precedent that has drawn "a thin line . . . between sovereign immunity and governmental liability."  Nat'l Bd. of YMCAs, 396 F.2d at 472.  While the line shielding the Government from liability is thin, precedent from the United States Court of Claims holds that, under the military necessity doctrine,

> the sovereign is immune from liability for confiscation of private property taken by [the military], through destruction or otherwise, to prevent it from falling into enemy hands, or to protect the health of troops, or as an incidental element of defense against hostile attack and is not compensable under the fifth amendment.

Franco-Italian Packing, 128 F. Supp. at 414; see also Nat'l Bd. of YMCAs, 396 F.2d at 472 ("The above-quoted expression is admittedly dictum, but we think it announces a principle of law which should be applied in deciding the issues raised by the particular facts of this case.").  2/

-------------------------------------------------------------------

2/  Defendant argues that these standards somehow implicate the justiciability of claims for military takings that occur in wartime or in a hostile environment.  The court disagrees.  As will be discussed in greater detail below, these cases stand for the proposition that the sovereign is immune from claims for takings occurring during wartime or that are rooted in military conflicts, including both the enemy property and military necessity doctrines.  As such, they do not constitute claims cognizable under the Fifth Amendment.  The only decisions cited by defendant that dismiss claims on justiciability grounds do so because the claims presented political questions.  See, e.g., El-Shifa, 378 F.3d at 1367; Ingenio Porvenir C. Por A. v. United States, 70 Ct. Cl. 735, 739 (1930).  Defendant places great emphasis on the holding of the Court of Claims in Ingenio Porvenir, urging that it constitutes binding precedent that military takings claims arising out of combat or hostile territories are nonjusticiable.  See Def.'s Br. filed July 12, 2010, at 5-6.

The court proceeds to examine whether the court possesses jurisdiction to consider plaintiff's claim.

## 2. Commission's determination on plaintiff's claim under the Foreign Claims Act

Plaintiff contends that "[m]ilitary conduct that is not incident to combat activities by U.S. military forces or that does not touch on the destruction or appropriation of enemy property" is compensable under the takings clause. Pl.'s Br. filed June 21, 2010, at 40 (emphasis omitted) (citing Argent, 124 F.3d at 1281-85). Based on Lt. Col. Peterson's letter, see id. Ex. 2, plaintiff argues that because the Government processed plaintiff's claims under the Foreign Claims Act, 10 U.S.C. § 2734 (2006) (the "FCA"), defendant is estopped from claiming that the U.S. military's occupation of plaintiff's property and its destruction of his wall were incident to combat or the result of an act of the enemy. 3/ Pl.'s Br. filed June 21,

_____

2/ (Cont'd from page 11.)

Ingenio Porvenir was decided over thirty years before Baker v. Carr, the Supreme Court's landmark case involving the political question doctrine. See Baker v. Carr, 369 U.S. 186, 217 (1962). Baker's test for determining whether a case presents a nonjusticiable political question is the standard that courts use today. E.g., El-Shifa, 378 F.3d at 1361 (applying Baker). To the extent that defendant argues that the case at bar raises a nonjusticiable political question, however, defendant has not argued that issue under Baker. The Federal Circuit in El-Shifa expanded on the summary explanation of the court's reasoning in Ingenio Porvenir and deemed it congruent with the case on review insofar as the act of taking over Santo Domingo was pursuant to a Presidential proclamation. See id. However, the Federal Circuit applied the standards set forth in Baker. Id. at 1361-65.

3/ The Foreign Claims Act provides, in pertinent part:

(a)   To promote and to maintain friendly relations through the prompt settlement of meritorious claims, the Secretary concerned, or an officer or employee designated by the Secretary, may appoint . . . one or more claims commissions . . . to settle and pay in an amount not more than $100,000, a claim against the United States for–

(1) damage to, or loss of, real property of any foreign country or of any political subdivision or inhabitant of a foreign country, including damage or loss incident to use and occupancy;

. . . .

2010, at 42-43.  Plaintiff claims that the Commission's "consideration of these claims establishes as a matter of law that the alleged property damage was not caused by an enemy and was not caused by combat activities of U.S. military personnel.  Otherwise, Defendant violated 10 U.S.C. § 2734(b)(3) by considering claims arising out of an act of an enemy or arising from an act by U.S. forces engaged in combat."  Id. at 43 (emphasis omitted).  In addition, plaintiff insists that this court must accept as true defendant's implied admission. Id. (citing Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir. 2009)).  4/

---

3/ (Cont't from page 12.)

if the damage, loss, personal injury, or death occurs outside the United States, or the Commonwealths or possessions, and is caused by, or is otherwise incident to noncombat activities of, the armed forces . . . .  In this section, "foreign country" includes any place under the jurisdiction of the United States in a foreign country. . . .

(b) A claim may be allowed under subsection (a) only if–

. . . .

(2) in the case of a national of a country at war with the United States, or of any ally of that country, the claimant is determined by the commission or by the local military commander to be friendly to the United States; and

(3) it did not arise from action by an enemy or result directly or indirectly from an act of the armed forces of the United States in combat . . . .

10 U.S.C. § 2734.

4/  Plaintiff's citation to Cary presumably refers to the legal standard applicable to appellate review of a judgment entered on the pleadings and pursuant to RCFC 12(c), which is the same standard that the court applies to a case dismissed pursuant to Fed. R. Civ. P. 12(b)(6), whereby the court "must presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff."  Cary, 552 F.3d at 1376.  In this case, however, defendant challenges the court's jurisdiction pursuant to RCFC 12(b)(1), and only unchallenged facts are deemed to be true.  Hamlet, 873 F.2d at 1416.  Thus, plaintiff cannot rely merely on allegations in the amended complaint, but instead must bring forth relevant competent proof to establish jurisdiction.  McNutt, 298 U.S. at 189.

Plaintiff cites no precedent that supports his assertion that the Commission's investigation of plaintiff's case and offer of compensation under the FCA constitutes a binding admission, or otherwise estops defendant from denying that the occupation of plaintiff's home and subsequent destruction of the surrounding wall were not incident to combat. As defendant correctly points out, "[n]othing within the FCA purports to give the Commission's findings (or the fact that it considered a case) preclusive findings within any Federal court." Def.'s Br. filed July 12, 2010, at 8. The fact that the Commission processed plaintiff's claim under the FCA does not constitute a binding admission concerning the factual circumstances giving rise to plaintiff's instant claim.

The FCA is a grant of discretionary authority to the Executive, see Niedbala v. United States, 37 Fed. Cl. 43, 52 (1996), and the Commission's investigation is not tantamount to adversarial litigation that implicates the doctrine of collateral estoppel. 5/ Nothing in the Commission's decision letter of September 4, 2007, purports to be factual findings. Even considering traditional notions of equitable estoppel, plaintiff has not shown any form of detrimental reliance or governmental misconduct. See People of Bikini v. United States, 77 Fed. Cl. 744, 768 (2007) (holding that to assert estoppel against Government plaintiffs must show detrimental reliance and "some form of affirmative misconduct"), aff'd, 554 F.3d 996 (Fed. Cir. 2009). Further, assuming *arguendo* that defendant were so estopped, this court

---

5/ Defendant argues that the FCA empowers only the Executive Branch, rather than the Judicial Branch, with authority to compensate foreign citizens as part of the Executive's management of foreign relations. See Def.'s Br. filed July 12, 2010, at 7-8. This implicitly supports defendant's argument that this matter is a nonjusticiable political question. See id. at 8; Transcript of Proceedings, [Doe] v. United States, No. [deleted] at 7 (Fed. Cl. Sept. 2, 2010) ("Tr."). Defendant cites as support for its position the United States Supreme Court's statement in Harisiades v. Shaughnessy, 342 U.S. 580 (1952), that

> any policy toward aliens is vitally and intricately interwoven with contemporary policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

Id. at 588-89 (holding that deportation of three resident aliens due to membership in Communist Party prior to enactment of Alien Registration Act of 1940 § 23, 8 U.S.C. § 137 (1946) (repealed 1952), did not violate Due Process Clause). However, as with the other cases cited by defendant, see supra note 2, issues implicating the political question doctrine must be resolved under the Baker framework, which is not necessary because the court has already concluded that the takings clause issue relevant to this case directly implicates the court's subject matter jurisdiction, without considering the political question doctrine.

would not be precluded from making an independent jurisdictional determination that the purported taking did arise out of combat (or at least serious hostilities) or an otherwise valid wartime military necessity.  The court concludes that plaintiff has not established that the FCA is dispositive of the present controversy. 6/

### 3. The military necessity doctrine

Turning to plaintiff's interpretation of the military necessity doctrine, plaintiff argues that "[m]ilitary conduct that is not incident to combat activities by U.S. military forces or that does not touch on the destruction or appropriation of enemy property can give rise to a valid takings claim." 7/  Pl.'s Br. filed June 21, 2010, at 40 (emphasis omitted).  "The existence of [a] military necessity is a function of exigent circumstances; that is, whether there is an 'impending danger in the context of a hostile confrontation'"; and that such "impending danger" must exist at the "moment at which the complained-of taking occurs."  Id. (quoting Nat'l Bd. of YMCAs, 396 F.2d at 471).  Defendant counters that the incident giving rise to plaintiff's claim did occur in combat; and, even if it did not, the military necessity doctrine's applicability is not limited to combat or to actions by an enemy force.  Moreover, defendant contends that controlling precedent "preclude[s] review of all claims arising from the actions of the military against an enemy."  Def.'s Br. filed July 12, 2010, at 4.

To support its contention that plaintiff's takings claim is barred by the military necessity doctrine, defendant offers two declarations from military officers who were in Fallujah during the period that Coalition Forces occupied plaintiff's property, see Gillette Declaration; Forkin Declaration (both describing intense fighting and military actions taken against insurgents).  Defendant notes that the Gillette Memorandum notifying plaintiff that Coalition Forces intended to occupy his property stated that the occupation was for "military necessity."  See Am. Compl. Ex. 2.  "It is irrelevant whether this military necessity was to acquire a better ground position for Coalition operations or to prevent the insurgents from using the home for the placement or storage of improvised explosive devices, ammunition,

_____

6/ Defendant disputes the applicability of the FCA because the FCA is a discretionary grant of authority to pay a claim and therefore is not a money-mandating statute.  Def.'s Br. filed July 12, 2010, at 7 (citing Niedbala, 37 Fed. Cl. at 52; Collins v. United States, 32 Fed. Cl. 256, 259 (1994)).  Defendant misses plaintiff's point.  Plaintiff is not bringing a claim pursuant to the FCA; rather, plaintiff argues, incorrectly, that having considered his claim under the FCA, defendant is precluded from contradicting what plaintiff characterizes as the Commission's findings.

7/ Plaintiff impliedly concedes that, should the court find that plaintiff's property was "enemy property," he would not have a takings claim.  However, he disputes that his property was "enemy property."

or booby traps.  Either use falls under the military necessity doctrine and excludes recovery."
Def.'s Br. filed Feb. 5, 2010, at 10-11.  The court agrees with defendant.

    1) <u>Caselaw dynamics</u>

    The parties dispute whether this issue has been addressed directly in prior caselaw so
as to dictate an outcome in the present controversy.  The following cases impart guidance on
the interplay of military takings and the takings clause and, in determining the threshold
jurisdictional issue to be decided—whether the actions of the USMC involving plaintiff's
property during the First Battle of Fallujah "paint a picture cognizable as a compensable
taking under the Fifth Amendment." <u>El-Shifa</u>, 378 F.3d at 1356.  In so doing, the court is
mindful of the instruction first announced by the Court of Claims in <u>National Board of
YMCAs</u> and reaffirmed by the Federal Circuit in <u>El-Shifa</u> to

> look to the general principles announced in the decisional law to find the
> narrow and sometimes indistinct line that separates losses that are necessary
> incidents of the ravages and burdens of war from those situations where the
> Government is obliged to pay compensation to the owner of private property
> that is taken for public use.

396 F.2d at 471, <u>quoted in</u> <u>El-Shifa</u>, 378 F.3d at 1356.  When the Supreme Court or the
Federal Circuit have not provided a binding precedential opinion, the Court of Federal
Claims is bound by the decisions of the Court of Claims.  <u>See</u> <u>S. Corp. v. United States</u>, 690
F.2d 1368, 1369 (Fed. Cir. 1982) ("We hold that the holdings of our predecessor court[], the
United States Court of Claims[,] . . . shall be binding as precedent in this court.").

    Governing precedent from the Supreme Court addressing the question of
compensability of military takings is somewhat sparse, but nevertheless illuminating.  First,
<u>Mitchell v. Harmony</u>, 54 U.S. (13 How.) 115 (1852), which is relied on by plaintiff to
support his claim for compensation, involved a takings claim arising out of the Mexican and
American War.  Upon the outbreak of war, plaintiff, a merchant who was a Spanish-born
naturalized citizen of the United States, voluntarily accompanied a trading expedition that
followed the U.S. Army into Mexican territory. <u>Id.</u> at 128-29.  As explained by Chief Justice
Taney, merchants were permitted to accompany the Army in order to trade with the Mexican
citizenry in order to "conciliate, by kindness and commercial intercourse, the Mexican
provinces bordering on the United States, and by that means weaken the power of the hostile
government of Mexico." <u>Id.</u> at 133.  At some point plaintiff was not permitted to abandon
the expedition and was forced to follow the Army against his will, with the Army
requisitioning his merchandise for use during the battle of Sacramento and a subsequent
march into Mexico. <u>Id.</u> at 128-30.  The Court concluded that a taking had occurred and that
it was compensable. <u>Id.</u> at 136.  Such a taking is compensable even if effected in order to

prevent property from falling into enemy hands.  Id. at 134 ("There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy . . . . Unquestionably, in such cases the government is bound to make full compensation to the owner . . . .").

In United States v. Russell, 80 U.S. (13 Wall.) 623 (1871), the owner of three steam boats agreed to allow the U.S. Army to use them to ferry Union troops during the Civil War, but without setting a price for compensation.  Id. at 628.  Although the Government made some payments, plaintiff's demands for a larger amount were refused.  Id.  The Court held that the taking was permissible due to necessity, but that the United States was bound to compensate the plaintiff.  Id. at 629 ("Private rights, under such extreme and imperious circumstances, must give way for the time to the public good, but the government must make full restitution for the sacrifice.").

In United States v. Pacific Railroad, 120 U.S. 227, 233-39 (1887), the Supreme Court addressed a takings claim arising out of the destruction of railroad bridges in Missouri during the Civil War.  The plaintiff brought a claim against the Government for unpaid fees for transportation services provided during the war.  Id. at 228.  Union forces had destroyed a number of bridges in order to impede the advance of the Confederate Army.  Id. at 229. Thereafter, Union forces repaired four of the bridges in order to advance against the Confederates.  Id. at 228, 231-32.  Defendant argued that any funds expended in repairing the bridges owned by the claimants should be offset against any amount owed the railroad. Id. at 229, 232.  Writing for a unanimous Court, Justice Field held that the railroad owed no offset to the Government, but went on to address, at some length, the question of whether the military's actions destroying the bridges constituted a taking.  Id. at 233-39.  In a departure from its prior holdings, the Court recognized an "exemption [from the Fifth Amendment] of government from liability for private property injured or destroyed during war, by operations of armies in the field, or by measures necessary for their safety and efficiency."  Id. at 239. 8/ Justice Field observed:

---

8/   However, Justice Field proceeded to limit the doctrine's applicability in cases where "property of loyal citizens is taken for the service of our armies, such as vessels, steamboats, and the like, for the transport of troops and munitions of war, or buildings to be used as store-houses and places of deposit of war material, or to house soldiers or take care of the sick, or claims for supplies seized and appropriated.  In such cases it has been the practice of the government to make compensation for the property taken."  Id. at 239. Interestingly, Justice Field then cast doubt upon that reasoning: "It's obligation to do so is supposed to rest upon the general principle of justice that compensation should be made where private property is taken for public use, although the seizure and appropriation of private property under such circumstances by the military authorities may not be within the terms of the constitutional clause."  Id. (emphasis added) (citing Harmony, 54 U.S. (13 How.) 134; Russell, 80 U.S. (13 Wall.) 623).

The destruction or injury of private property in battle, or in the bombardment of cities and towns, and in many other ways in the war, had to be borne by the sufferers alone, as one of its consequences. Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction. The necessities of the war called for and justified this. The safety of the state in such cases overrides all considerations of private loss.

Id. at 234; see also Caltex (Phil.), 344 U.S. at 154 ("Therefore, whether or not the principle laid down by Justice Field was dictum when he enunciated it, we hold that it is the law today.").

Similarly, in Juragua Iron Co., Ltd. v. United States, 212 U.S. 297, 301-02 (1909), the Court denied a takings claim brought by the owners of sixty-six buildings in Cuba that were destroyed by the military during the Spanish-American War. At the time of the alleged taking, U.S. forces engaged in military operations in Cuba "became endangered by the prevalence of yellow fever, and it was deemed necessary by the officers in command, in order to preserve the health of the troops and to prevent the spread of the disease, to destroy all places of occupation or habitation which might contain the fever germs," including the plaintiff's buildings. Id. at 301. The Court concluded that no liability could be found under either the takings clause or under a theory of implied contract "in respect of property destroyed by the United States in the course of military operations for the purpose, and only for the purpose, of protecting the health and lives of its soldiers actually engaged at the time in war in the enemy's country." Id. at 305; see also id. at 309 ("[T]he owner of the property has no claim of any kind for compensation or damages . . . .") (emphasis added).

In Caltex (Philippines), 344 U.S. at 150-51, the owners of oil-holding facilities alleged a compensable takings claim for the destruction of the facilities by the United States following Japan's attack on Pearl Harbor and subsequent invasion of the Philippines. As the Japanese entered Manila, U.S. Army personnel, at the direction of General MacArthur, successfully demolished plaintiff's terminal oil facilities in order to prevent the seizure and use of the facilities and stored oil by the enemy. Id. The Court held that the United States was not liable for the destruction of the terminal facilities: "The short of the matter is that this property, due to the fortunes of war, had become a potential weapon of great significance to the invader. It was destroyed, not appropriated for subsequent use. It was destroyed that the United States might better and sooner destroy the enemy." Id. at 155. The Court reasoned: "The terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war. This Court has

long recognized that in wartime many losses must be attributed solely to the fortunes of war, and not to the sovereign." Id. at 155-56.

The Court of Claims consistently has ruled consonantly with these holdings. Among the first decisions was Perrin, 4 Ct. Cl. 543, a case refreshingly free from the strictures of political correctness, and which was described by the Federal Circuit in El-Shifa as a "seminal case in [the enemy property doctrine's] decisional law." 378 F.3d at 1356 ("While the phrase 'enemy property' seems to have its origins as a term of art for prize courts, Perrin was the first case in which the outlines of the enemy property doctrine applicable to takings jurisprudence can be recognized."). The case had its genesis in the bombardment and utter destruction of the city of Greytown, Nicaragua, by the U.S. Navy, acting under the orders of the President. Perrin, 4 Ct. Cl. at 545-47 (noting that "inhabitants of Greytown . . . had been guilty of many outrages and depredations upon the persons and property of the citizens of the United States"). Contemporaneous with l'affaire Greytown, the Perrins, French citizens who were not hostile to the United States, were domiciled temporarily in Greytown and had stored in the town merchandise of some value. Id. at 546. As a result of the bombardment, the Perrins' merchandise was destroyed. The Court of Claims dismissed the Perrins' takings claim on the ground that it involved a nonjusticiable political question, as its resolution "necessarily rest[ed] upon the assumption that the bombardment and destruction of Greytown was illegal and not justified by the law of nations." Id. at 547. The court explained that, with respect to the takings claim:

> No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy; much less is any government bound to pay for the property of neutrals domiciled in the country of its enemy, which its forces may chance to destroy in its operations against such enemy.

Id. at 547-48. The fact that the claimants were not hostile to the United States was of no consequence. See id. at 548 ("The principle affirmed is, that one who takes up residence in a foreign place and there suffers an injury to his property by reason of belligerent acts committed against that place by another foreign nation, must abide the chances of the country in which he chooses to reside; and his only claim, if any, is a personal one against the government of that country in which his own sovereign will not interest himself."). As the Perrins' property was located in a country hostile to the United States, the court designated it as enemy property subject to military destruction and dismissed the complaint. Id. at 548.

Ingenio Porvenir C. Por A. v. United States, 70 Ct. Cl. 735 (1930), involved the taking of commodities during the U.S. military's occupation of Santo Domingo in 1916. In facts similar to those before this court, the President of the United States in 1916 authorized the Navy to occupy Santo Domingo and take control of the government. Id. at 738. The

occupying military provisional government requisitioned sugar owned by the plaintiff, an American company, and prohibited its sale on the open market. Id. When the provisional government finally released the sugar, the market price of the sugar had declined in value, and the provisional government promised to pay the difference. Id. The Court of Claims held that the plaintiff could not recover on either a takings or contract theory because the claim constituted a nonjusticiable political question. Id. at 739-40. The court reasoned:

> In a general way, the act of taking over the Government of Santo Domingo and all the proceedings thereunder were political matters as to which we have no jurisdiction. Under the Constitution the President is the Commander-in-Chief of the Army and Navy, and this court has no jurisdiction to review his acts in exercising the power so granted in a foreign country and base a judgment thereon. The acts which are claimed to fix a liability on the defendant were done under the orders of the President and occurred in a foreign country. The policy which he adopted and the acts done pursuant thereto were matters of state and wholly within his discretion.

Id. at 739. This holding subsequently was endorsed by the Federal Circuit in El-Shifa. See supra note 3.

Aleutian Livestock Co. v. United States, 96 F. Supp 626, 627 (Ct. Cl. 1951), was another takings claim brought following U.S. military actions during the Second World War. The plaintiff had a business producing wool on the Aleutian Islands. On July 5, 1942, in the face of a threatened Japanese occupation, the United States invoked a military necessity to evacuate the island's inhabitants, including the plaintiff's employees. Id. Because the plaintiff's sheep were left unattended from July 5, 1942, until December 15, 1942, several thousand died. Id. at 627-28. The court held that the loss was "incident to the exercise of the sovereign power and duty to protect the people from attack by a hostile power," losses for which "the sovereign is immune." Id. at 628. Its holding was grounded in the doctrine of necessity, which grants the sovereign immunity for the consequences of actions taken to protect the public health and welfare. Id. The court explained that this includes the consequences of military necessity. "A fortiori the sovereign is immune from liability for the consequences of an evacuation order issued under the war powers to insure the safety of the country against enemy attack. The general welfare in such cases overrides considerations of private loss." Id.

In Franco-Italian Packing, the Court of Claims reviewed a takings claim following the seizure of fishing vessels off of the coast of Costa Rica in the days following the Japanese

attack on Pearl Harbor.  128 F. Supp. at 409-10. 9/  The presence of fishing vessels was considered a "serious threat to the security of the Panama Canal" because of the presence of Japanese nationals on these vessels and because "loyal Americans among the fishing crews could be captured and coerced into providing military information to the enemy, and also that the fishing vessels could be seized, and their fuel oil and other supplies used by Japanese submarines." Id. at 410.  The court held that the action was taken as a defensive measure and, as such, was an "exercise of sovereign powers not constituting an appropriation of plaintiff's property for public use." Id. at 414.  This rationale extended to the value of the consequential loss of the plaintiff's fish and other supplies. Id. at 415 ("[C]onsequential losses resulting from the exercise of a sovereign military power are not compensable.").

In National Board of YMCAs, 396 F.2d 467, the plaintiffs brought a takings claim after a rioting mob of miscreants in the Panama Canal Zone, undoubtedly provoked by Communist agitators, caused severe damage to their buildings in which U.S. troops had taken temporary refuge to avoid further casualties. Id. at 469-70.  The Court of Claims found no compensable taking because "the destruction of private property in battle or by enemy forces is not compensable." Id. at 470.  Even though the United States was not at war with the Republic of Panama at the time of the alleged taking, the court applied the general legal principles that govern when "military forces of this country are engaged in combat with a public enemy," given that U.S. forces were "confronted with a large and hostile force under conditions presenting immediate danger to them, as well as to the lives and property of American citizens in the Canal Zone." Id. at 470-71. 10/

In American Manufacturers Mutual Insurance Co. v. United States, 453 F.2d 1380, 1380-81 (Ct. Cl. 1972), the Court of Claims held that no taking had occurred when a ship, moored in the city of Santo Domingo in the Dominican Republic and insured by the plaintiff,

---

9/  The court also discussed the authority of officers to make offers to compensate for losses. See 128 F. Supp. at 416.

10/  National Board of YMCAs does not concern enemy property, nor a military taking during wartime.  The case leaves open the possibility that a takings claim may be maintained for "requisitioning or takings [of] plaintiff's buildings to house soldiers." Id. at 473-74.  Moreover, the court's statement that "[i]t is axiomatic that the fifth amendment is not suspended in wartime" contradicts defendant's blanket proposition that cases are not reviewed arising out of military actions during wartime. Id. at 470.  The court concluded its analysis of military takings caselaw by explaining that "the decisions have rather consistently placed on the opposite sides of that line a temporary occupancy of private property which is immediately necessary for the safety of troops or to meet an emergency threatening great public danger and a voluntary appropriation of private property under conditions where there is no compulsive use or occupancy in the face of imminent danger." Id. at 472.

was destroyed by the U.S. Army.  The ship had been seized by rebels who fired upon U.S. Army forces while they were in the city protecting United States nationals.  Id. at 1380.  The Army returned fire, sinking the ship.  Id.  The court held that "the ship was destroyed in connection with the carrying on of military operations of the United States Army for the protection of its citizens in what amounted to a civil war," explaining that "the vessel was destroyed as a part of the fortunes of war and by actual and necessary military operations in attacking and defending against enemy forces.  Accordingly, there was no compensable taking of the property."  Id. at 1381.

### 2) Application to plaintiff's takings claim

The foregoing precedent establishes that plaintiff's claim does not constitute a compensable taking under the Fifth Amendment.  Neither applicable precedent nor the facts of this case support plaintiff's contention that this claim falls within the particularized category of non-combat-related military takings and, therefore, is cognizable under the Fifth Amendment.  11/

To the extent plaintiff argues that—in order for a military taking to fall outside of the Fifth Amendment—the action must involve either actual combat or the appropriation of enemy property, plaintiff confronts precedent that applies the military necessity doctrine to situations that fairly cannot be described as actual combat.  E.g., Nat'l Bd. of YMCAs, 396 F.2d at 471 (applying doctrine of military necessity to confrontation with rioting mob and

---

11/  Plaintiff cites Argent, 124 F.3d at 1281-85, for the proposition that "[m]ilitary conduct that is not incident to combat activities by U.S. military forces or that does not touch on the destruction or appropriation of enemy property can give rise to a valid taking claim."  Pl.'s Br. filed June 21, 2010, at 40.  Argent, however, can be distinguished from the factual and legal issues raised in the case at bar.  First, Argent involved an inverse condemnation takings claim of navigation easements over and around the plaintiffs' property in Washington State, which arose from noise generated by peacetime military training aircraft overflights that interfered with the plaintiffs' use and enjoyment of their property.  See Argent, 124 F.3d at 1281-83.  Second, neither the military nor enemy property doctrines were at issue in Argent.  See id.  It is this context, shorn of the military and enemy property doctrines, to which the Federal Circuit referred in El-Shifa when it stated that "[m]ilitary conduct that does not touch on the destruction or appropriation of enemy property can sometimes give rise to a valid takings claim."  378 F.3d at 1356 (emphasis added).  Argent presents an example of the type of military conduct that is actionable under the Fifth Amendment.  However, such conduct cannot be equated with the military operations against the Iraqi insurgency during the battles of Fallujah.  Argent provides no support for the proposition that actual combat activity is necessary for a military takings claim to be non-compensable under the Fifth Amendment.

concluding that the "same principles of law are to be applied here as obtain in a case where the military forces of this country are engaged in combat with a public enemy"); Franco-Italian Packing, 128 F. Supp. at 414-15 (finding no liability for seizure of fishing vessels following attack on Pearl Harbor); Aleutian Livestock, 96 F. Supp. at 627 (finding no liability for non-combat-related removal of sheep herders that resulted in loss of livestock); cf. Caltex (Phil.), 344 U.S. at 155 (finding no liability for seizure and destruction of oil terminal facilities in face of imminent invasion by Japanese army, though not occurring in actual combat).  Nor need a state of de jure or de facto war with the United States exist for the principle to apply.  See, e.g., Am. Mfrs. Mut. Ins., 453 at 1381 (sinking of ship not compensable when in response to "carrying on of military operations . . . for the protection of its citizens in what amounted to a civil war"); see also Aris Gloves, Inc. v. United States, 420 F.2d 1386, 1392 (Ct. Cl. 1970) ("However, it seems to be generally well-accepted that the mere cessation of hostilities does not necessarily terminate the war power.  The war power continues past the end of hostilities and into that period during which the evils which gave rise to the hostilities are sought to be remedied." (citations omitted)).

Plaintiff cites to Mitchell v. Harmony and United States v. Russell for the proposition that, "[i]f there is no military necessity at the time of the taking or if the military necessity ceases to exist and the taking continues, the Fifth Amendment requires that the United States pay fair compensation."  Pl.'s Br. filed June 21, 2010, at 40-41 (emphasis omitted).  Putting aside that neither case provides any support for such an assertion, they are both among the few cases that  permit compensation for military takings occurring during a time of conflict or war.  See Harmony, 54 U.S. at 136 (finding compensable taking for taking of supplies during Mexican-American war); Russell, 80 U.S. at 629 (finding compensable taking for use of steam boats to ferry troops during Civil War).  12/  However, both Harmony and Russell

_____

12/  Additionally, at oral argument on September 2, 2010, plaintiff invoked Grant v. United States, 1 Ct. Cl. 41 (1863), and Wiggins v. United States, 3 Ct. Cl. 412 (1867), two Court of Claims cases that were roughly contemporaneous with Harmony and Russell, to support the argument that military necessity is not an automatic denial of relief.  See Tr. at 64-68.  Plaintiff argues that both Wiggins and Grant involved military takings in situations akin to plaintiff's, i.e., the military was not under direct or imminent attack when the necessity arose, but in both cases the court found the takings were compensable acts of eminent domain.  Plaintiff links these situations with the need for imminent danger found by the court in National Board of YMCAs, see supra note 10, to argue that they are directly on point, as defendant cannot show the same degree of imminent danger during the occupation of plaintiff's home.  See Tr. at 66-68.

Plaintiff's reliance on Wiggins and Grant is misplaced.  It is not necessary to discuss these two Civil War ear cases in detail except to note that whatever precedential impact these cases might have had was abrogated by the Supreme Court in Caltex (Philippines), 344 U.S.

largely have been abrogated by later cases from the Supreme Court and the Court of Claims. See, e.g., Caltex (Phil.), 344 U.S. at 153-54 (explaining that "language in those two cases [supporting takings claims] is far broader than the holdings," because both cases "involved equipment which had been impressed by the Army for subsequent use by the Army," and holding that Justice Field's opinion in Pacific Railroad "to be the law today"); Nat'l Bd. of YMCAs, 396 F.2d at 471 (distinguishing Harmony and Russell on ground that neither case "involved a situation where private property was destroyed while serving as a temporary refuge for our military forces during an actual confrontation with hostile enemy forces," and further explaining that "the property in those cases was requisitioned in a manner much akin to the procurement of goods and services under contract—in the absence of immediate danger, after deliberation, and for a somewhat later and less temporary use"). 13/ Moreover, both cases are distinguishable. Harmony concerned a suit against the officer who detained the plaintiff on suspicion that he might trade with the enemy. See Harmony, 54 U.S. at 132-33. The alleged taking in Russell was for the value of services rendered in transporting troops, not for the loss or destruction of property. See Russell, 80 U.S. at 632 ("Neither of the steamers was destroyed nor is anything claimed as damages . . . ."). Here, by contrast, plaintiff seeks compensation for the alleged destruction of real property. As Justice Vinson concluded in Caltex (Philippines), this court finds that "[a] close reading of the [Harmony] and Russell cases shows that they are not precedent to establish a compensable taking in this case." 344 U.S. at 153.

---

12/  (Cont'd from page 23.)

149. Both Wiggins and Grant were viewed by the Court of Claims as binding precedent for the proposition that the Government is liable under the Fifth Amendment for a taking of property—not possessed by the enemy or destroyed as an incident of battle—that otherwise is deliberately destroyed by the military. See Caltex (Phil.), Inc. v. United States, 100 F. Supp. 970, 975-79 (Ct. Cl. 1951), rev'd, 344 U.S. 149 (1952). The court characterized the applicable portion of Justice Field's opinion in Pacific Railroad as gratuitous dictum, "[a]nd the dictum is contrary to the dictum in Mitchell v. Harmony and to the holdings of the Grant and Wiggins cases." Id. at 976. As such, the court held the Government liable for the destruction of terminal oil facilities at the onset of Wold War II. Id. at 979. The Supreme Court reversed, specifically holding that the view of Justice Field in Pacific Railroad "is the law today." 344 U.S. at 154.

13/  But see Seery v. United States, 127 F. Supp. 601, 605-06 (Ct. Cl. 1955) (holding takings claim arising out of use of plaintiff's lake-side Austrian villa as officers' club some months after end of hostilities to be compensable; following Austria's unconditional surrender, property was not "enemy property" when Austria was no longer enemy territory and no further enemy activities were taking place).

Other than asserting that the FCA determination letter establishes that the alleged taking was not caused by combat activities or by an enemy, which the court already has rejected, plaintiff has produced no evidence substantiating his claim as a compensable military taking. 14/  See McNutt, 298 U.S. at 189 (holding that once defendant or court challenges subject matter jurisdiction, plaintiff has burden of establishing jurisdiction with relevant competent proof).  Indeed, the record discloses ample evidence for the court to find that U.S. military forces occupied plaintiff's house, if not during actual combat, at least during an overall period of violent hostilities against Coalition Forces, and therefore cannot be the basis of a cognizable taking under the Fifth Amendment.  When deciding a 12(b)(1) motion, the court may consider evidentiary matters outside the pleadings, and the Gillette Declaration and Forkin Declaration are relevant, competent evidence characterizing the military situation.  Specifically, the declarations show that, beginning in March 2004, "hardcore groups of insurgents" began to overrun Fallujah, and they engaged in violent attacks against Coalition Forces "throughout the entire city and surrounding area."  Gillette Declaration ¶¶ 6-7.  During the ensuing battle to regain control of the city, USMC forces were engaged in urban combat, including "house to house fighting," described as "some of the heaviest city fighting in United States Marine Corps history."  Id. ¶ 7.  Due to military necessity, Coalition Forces temporarily would occupy buildings in and around the city. Id. ¶ 8.

Similar to the conditions encountered by U.S. forces in National Board of YMCAs, the Marines in Fallujah were confronted "with a large and hostile force under conditions presenting immediate danger to them."  396 F.2d at 470.  The existence of a military necessity is not a matter of exigent circumstances, contrary to plaintiff's assertions.  Pl.'s Br. filed June 21, 2010, at 40.  Nothing in National Board of YMCAs establishes that the "impending danger" discussed in that case limits the necessity to "hostile confrontation[s]" existing at the time of the taking.  See 396 F.2d at 471.  In other words, crowds  need not be banging-down the castle door for the necessity to present itself.  See id. at 473 ("Mindful of the Supreme Court's caveat in Caltex that each case in this category must be judged on its own facts, we refrain from laying down any broad or general rule.").

In the urban combat situation confronting USMC forces at Fallujah, insurgents were not located in one isolated area, but were dispersed into groups throughout the city.

---

14/  Plaintiff also alleges that, at the time of the taking, the "United States was subject to a United Nations mandate to promote the welfare of the people of Iraq.  This mandate created legal duties requiring the United States to compensate Plaintiff for any damages and inconvenience caused by its occupation of his property."  Pl.'s Br. filed June 21, 2010, at 6-7. Plaintiff points to the Gillette Memorandum as evincing that the United States accepted this mandate.  Id. at 7.  Assuming, arguendo, that plaintiff's argument is correct, it does not follow that this United Nations mandate negates the military necessity doctrine.

Insurgents used public buildings and private homes to store improvised explosive devises ("IEDs") and set booby traps. Gillette Declaration ¶ 7. The Marines who occupied plaintiff's home were not required to be engaged in an actual fire-fight for the court to find that their occupation was done "as an incidental element of defense against hostile attack." Franco-Italian Packing, 128 F. Supp at 414; see also Nat'l Bd. of YMCAs, 396 F.2d at 472 (holding the quotation from Franco-Italian Packing to be a principle of law). Morever, the evident necessity justifying the razing of plaintiff's wall was pleaded to in plaintiff's amended complaint: "The reason given for such destruction was military necessity (*i.e.*, to diminish the probability of insurgents using the wall as cover to fire on Coalition Forces)." Am. Compl. ¶ 7.

Were the court to adopt plaintiff's theory, it must conclude that, at the time Coalition Forces occupied plaintiff's property, they were exercising the Government's civil eminent domain authority. As explained by the Federal Circuit in El-Shifa, compensable military takings under the Fifth Amendment occur when "the military merely carries out the sovereign's eminent domain prerogative," 378 F.3d at 1356, whereas when a military taking occurs pursuant to the exercise of the sovereign's "war-making functions," the sovereign is immune from liability and the claim is not cognizable under the Fifth Amendment, id. at 1356, 1359; see also Nat'l Bd. of YMCAs, 396 F.2d at 472; Franco-Italian Packing, 128 F. Supp. at 414-15. The conclusion that Coalition Forces were exercising the Government's civil eminent domain authority by occupying plaintiff's property, and by destroying the surrounding wall in order to prevent the enemy from using it as cover to continue their attacks during the Battle of Fallujah, strikes this court as absurd in the extreme. There comes a point in law when creativity and persistence in legal advocacy must give way to common sense.

Accordingly, the court concludes that occupation of plaintiff's home and the destruction of his wall by Coalition Forces were "exercises of sovereign powers not constituting appropriations of plaintiff's property for public use." Franco-Italian Packing, 128 F. Supp. at 414. Consequently, plaintiff's takings claim is not cognizable under the Fifth Amendment. Plaintiff's claim for compensation due to the destruction of his home subsequent to its abandonment by Coalition Forces also is not cognizable. See Aleutian Livestock, 96 F. Supp. at 628 (holding that consequential losses resulting from exercise of sovereign military power are not compensable). The unfortunate loss of plaintiff's house is yet another addition to the long, sad catalog of wartime property losses that "must be attributed solely to the fortunes of war, and not to the sovereign." Caltex (Phil.), 344 U.S. at 155-56. 15/

---

15/ Alternatively, defendant invokes the enemy property doctrine to charge that, regardless of whether the occupation could be fairly categorized under the military necessity doctrine, plaintiff's claim is still precluded as his property is "enemy property" for purposes

_____

15/ (Cont'd from page 26.)

of the takings clause.  Under Perrin and its progeny, defendant contends that, enemy property encompasses "all property held by a foreign citizen in a foreign country, regardless of the loyalties of the citizen."  Def.'s Br. filed July 12, 2010, at 3 (citing Perrin, 4 Ct. Cl. at 548). Considering the magnitude of the military operations suppressing the insurgency in Iraq from May through December 2004, as well as the intense violence directed at Coalition Forces in Fallujah during that period, Fallujah at that point in time can be classified as hostile or enemy territory.  Because Fallujah was a hostile territory at the time of the occupation of plaintiff's home, plaintiff's "mere ownership of land" therein results in his property being categorized as "'enemy property' for purposes of takings jurisprudence."  Def.'s Br. filed Feb. 5, 2010, at 10.

Without discussing a single case cited by defendant, or squarely addressing the scope of the enemy property doctrine, plaintiff rejoins that the Fifth Amendment is not suspended in wartime and, therefore, defendant's characterization of plaintiff's property as enemy property is incorrect.  Defendant made no showing that the Coalition Forces's occupation of the property and destruction of the wall "were incident to combat activities of U.S. military personnel in that place and at that time."  Pl.'s Br. filed June 21, 2010, at 6 (emphasis added).

Had the destruction of plaintiff's property occurred during the initial ground invasion or as the result of a direct attack against the insurgents by Coalition Forces, the application of the enemy property doctrine to plaintiff's property would be straightforward.  The issue that plaintiff presents, however, is whether the enemy property doctrine applies in a situation where the lost property was owned by a person neither neutral nor hostile to the United States, but an ally collaborating with Coalition Forces; where the property was not being used by enemies of the United States at the time of the occupation, cf. El-Shifa, 378 F.3d at 1360-61 ("Indeed, under our precedent, if it were actually true in 1998 . . . that the nation's terrorist enemies were using the Plant to manufacture chemical weapons destined for use against American citizens and interests around the globe, then the appellant's property loss would be subsumed by the enemy property doctrine, and that would be the end of it."); and where the political status of Iraq was such that it could not be categorized squarely as that of an "enemy" of the United States, cf. Perrin, 4 Ct. Cl. at 547-48; Pac. R.R., 120 U.S. at 234; Juragua Iron, 212 U.S. at 305; but see Caltex (Phil.), 344 U.S. at 155 (finding no compensation where property "had become a potential weapon"); El-Shifa, 378 F.3d at 1360 (construing Caltex (Phil.) as an enemy property case).

Plaintiff's status as an ally of the United States has no relevance to the issue.  For purposes of takings jurisprudence under the enemy property doctrine, the label "enemy property" attaches to the property, not to the litigant.  However, because the court already has

4. Plaintiff's standing to bring a takings claim

Alternatively, defendant challenges plaintiff's standing to bring a takings claim, contending that a foreign national cannot bring a takings claim for property located abroad unless he demonstrates a substantial connection to the United States.  To resolve this issue, the court must determine "whether a foreign citizen with no connections to the United States has a right to just compensation under the Fifth Amendment for a taking of property that occurs in a foreign country."  Atamirzayeva v. United States, 524 F.3d 1320, 1322 (Fed. Cir. 2008); see also El-Shifa, 378 F.3d at 1351 (reviewing "whether the Takings Clause reaches property owned by a nonresident alien located beyond the shores of the United States").

1) Standards applicable to standing to pursue takings claim

The Constitution is subject to territorial limitations.  Atamirzayeva, 524 F.3d at 1322. The Federal Circuit has held that the takings clause extends to property located on foreign soil but owned by a citizen of the United States.  See Langenegger v. United States, 756 F.2d 1565, 1570 (Fed. Cir. 1985) (U.S. citizen had standing to allege taking of property located in El Salvador); Seery v. United States, 127 F. Supp. 601, 603 (Ct. Cl. 1955) (U.S. citizen has standing to bring takings claim for property located in Austria); Wiggins v. United States, 3 Ct. Cl. 412, 422 (1867) (U.S. citizen has standing to bring takings claim for property located in Costa Rica).  However, for a nonresident alien to have standing to invoke the takings clause, the expropriated property must either be located in the United States or its territories, see Russian Volunteer Fleet v. United States, 282 U.S. 481, 489 (1931) (holding that takings clause applies to property owned by foreign corporation but located within United States), or the nonresident alien must establish a substantial connection to the United States, Atamirzayeva, 524 F.3d at 1329.  As correlative to subject matter jurisdiction, plaintiff bears the burden of establishing  standing to adjudicate his takings claim in federal court.  McNutt, 298 U.S. at 189.  Defendant argues that plaintiff has failed to plead sufficiently a valid takings claim because plaintiff, a foreign national who resided in Iraq at the time of the alleged taking and whose appropriated property was located in Iraq, has not established any substantial connections between himself and the United States.  See Def.'s Br. filed Feb. 5, 2010, at 14.

---

15/  (Cont'd from page 27.)

determined that plaintiff's takings claim is not cognizable under the Fifth Amendment due to the military necessity doctrine, a determination of whether plaintiff's property was "enemy property" is not necessary.

Plaintiff responds that the substantial connections test is inapplicable to his claim because the United States exercised sovereign power in Iraq at the time of the alleged taking and, as such, fundamental constitutional rights, including rights guaranteed by the Fifth Amendment's takings clause, extend to any territory in which the United States exercises such sovereignty. In the alternative, plaintiff argues that he has sufficient contacts with the United States because the United States had a "unique relationship of trust and responsibility to the people of Iraq generally" and had "voluntarily established a significant relationship to Plaintiff" by making "explicit promises to him." Pl.'s Br. filed June 21, 2010, at 8.

> 2) <u>Unique relationship between the United States and Iraq or the United States and plaintiff</u>

According to plaintiff, at the time of the alleged taking, sovereign power vested in the CPA, which, plaintiff asserts, was a "subsidiary entity of the United States Department of Defense." Pl.'s Br. filed June 21, 2010, at 8. <u>16</u>/ Plaintiff submits an array of documents regarding the CPA to confirm United States control over the CPA. These include United Nations Security Council Resolution 1483 (2003) ("Resolution 1483"), <u>17</u>/ an OMB report

---

<u>16</u>/ Plaintiff directs the court's attention to a Congressional Research Service ("CRS") report that provides an "analysis of the somewhat murky pedigree of the [CPA]." Pl.'s Br. filed June 21, 2010, at 8 n.2. However, the CRS report summary undermines plaintiff's foundational theory that the CPA was a subsidiary entity of the Defense Department:

> It is unclear whether CPA is a federal agency. Competing, though not necessarily mutually exclusive, explanations for how it was established contribute to the uncertainty about its status. . . . Some executive branch documents support the notion that it was created by the President, possibly as the result of a National Security Presidential Directive (NSPD). (This document, if it exists, has not been made available to the public.) The other possibility is that the authority was created by, or pursuant to, United Nations Security Council Resolution 1483 (2003).

L. Elaine Halchin, Cong. Research Serv., RL 32370, <u>The Coalition Provisional Authority (CPA): Origin, Characteristics, and Institutional Authorities</u>, at [i] (2004); <u>see also id.</u> at 35 (describing CPA as a "multinational effort").

<u>17</u>/ The relevant language of Resolution 1483 provides:

> *Noting* the letter of 8 May 2003 from the Permanent Representatives of the United States of America and the United Kingdom of Great Britain and

to the United States Congress, a letter from the United States Permanent Representative to the UN addressed to the President of the UN, two memoranda from United States President George W. Bush, and Pub. L. No. 108-106. Because the CPA exercised governmental authority over Iraq, plaintiff reasons that the United States, by extension, exercised sovereign authority over Iraq for purposes of the Fifth Amendment.

Plaintiff also contends that he is not required to meet the substantial connections test because the United States created a "unique relationship" with the people of Iraq when it exercised sovereign authority over Iraq. Plaintiff cites Juda v. United States, 6 Cl. Ct. 441, 457 (1984), for the proposition that "U.S. acts of sovereign power in a foreign jurisdiction occupied pursuant to U.N. Resolution could create a 'unique relationship' between the United States and the occupied state *even though* the United States had explicitly denied in advance its intention to act as a sovereign." Pl.'s Br. filed June 21, 2010, at 15; see also id. at 17-18. Plaintiff postulates that Iraq had become an unincorporated territory of the United States because the United States, acting through the CPA, exercised unprecedented sovereignty over Iraq. Id. at 16. 18/ In so doing, the United States extended "fundamental constitutional rights to the people of Iraq," including the Fifth Amendment right to just

---

17/ (Cont'd from page 29.)

Northern Ireland to the President of the Security Council (S/203/538) and recognizing the specific authorities, responsibilities and obligations under applicable international law of these states as occupying powers under unified command (the "Authority"),

. . . .

4. *Calls upon* the Authority, consistent with the Charter of the United Nations and other relevant international law, to promote the welfare of the Iraqi people through the effective administration of the territory, including in particular working towards the restoration of conditions of security and stability and the creation of conditions in which the Iraqi people can freely determine their own political future . . . .

S.C. Res. 1483, at 2, U.N. Doc. S/RES/1483 (May 22, 2003).

18/ Plaintiff defines an unincorporated territory as "those territories that are not destined for statehood but in which the United States exercises sovereign power." Pl.'s Br. filed June 21, 2010, at 16. This is not accurate. See United States v. Verdugo-Urquidez, 494 U.S. 259, 268 (1990) (defining unincorporated territory as "one not clearly destined for statehood" without reference to sovereignty).

compensation.  Id. at 16-17.  Based on the existence of this unique relationship, plaintiff would achieve standing to bring his Fifth Amendment claim in the Court of Federal Claims.

Defendant demurs that Juda is factually distinguishable from this case and proffers that Congress never acted to make Iraq an unincorporated territory of the United States. Def.'s Br. filed July 12, 2010, at 13 (citing Resolution 1483).  Moreover, the relationship between the United States and the inhabitants of the Trust Territories in Juda was delineated expressly by statute.  See 48 U.S.C. § 1681 (1982), quoted in Juda, 6 Cl. Ct. at 444.  It was the explicit assumption of responsibility between Congress and the Executive Branch to administer the Marshall Islands that created the unique relationship referred to by the court in Juda, because it "'exceeded in both nature and degree the relationship normally taken with a foreign country or by a trustee charged to protect the inhabitants against the loss of their lands and resources and to protect their health.'"  Def.'s Br. filed Feb. 5, 2010, at 18 (quoting Juda, 6 Cl. Ct. at 457).

Defendant also rejects plaintiff's assertion that Iraqi citizens enjoy full constitutional protections because the United States exercised sovereign authority over Iraq.  Any actions of the United States military in Iraq were taken "pursuant to the United States' relationship initially with the [CPA] and then with the Iraqi Interim Government."  Id. at 14-15. Defendant cites to language in Resolution 1483 that reaffirmed "the sovereignty and territorial integrity of Iraq," S.C. Res. 1483, at 1, U.N. Doc S/RES/1483 (May 22, 2003), and its recognition that the nations comprising the CPA acted as "occupying powers under unified command," id. at 2; see also Def.'s Br. filed Feb. 5, 2010, at 15.  Also, in May 2003 President Bush officially recognized Iraq's sovereign immunity, prohibiting suits against Iraq in U.S. federal court, see 68 Fed. Reg. 26,459 (May 7, 2003) (suspending sanctions on Iraq and making inapplicable certain statutory provisions related to Iraq), an action affirmed by the Supreme Court in Republic of Iraq v. Beaty, 129 S. Ct. 2183, 2187 (2009).  Finally, defendant observes that, beginning in June 2004, the CPA dissolved, and full governmental authority was transferred to the Iraqi Interim Government (the "IIG").  See S.C. Res. 1546, at 1, U.N. Doc. S/RES/1546 (June 8, 2004) (recognizing dissolution of CPA and assumption of full governmental authority by IIG).  Therefore, at the time that plaintiff's home was destroyed in October 2004, the IIG, not the CPA or any other alleged U.S. governmental agency, exercised sovereign power in Iraq.  For the following reasons, the court agrees with defendant.

Plaintiff cannot overcome the weight of law against the propositions that the United States was the sovereign in Iraq or that Iraq was an unincorporated territory of the United States at the time of the occupation of his house.  First, plaintiff does not rely on any precedent, or even a single case, that establishes that the United States acquires de jure sovereignty over a country because United States military forces temporarily occupy it, even if those forces exercise some form of governmental authority during that time.  Plaintiff

ignores <u>Johnson v. Eisentrager</u>, 339 U.S. 763 (1950), which held that captured German prisoners of war "at no relevant time were within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." <u>Id.</u> at 778.  The United States may

> acquire territory by discovery, by agreement or treaty, and by conquest.  It cannot also be gainsaid that, as a general rule, whenever a government acquires territory as a result of any of the modes above stated, the relation of the territory to the new government is to be determined by the acquiring power in the absence of stipulations upon the subject.

<u>Downes v. Bidwell</u>, 182 U.S. 244, 300 (1901) (White, J., concurring) (concluding that Puerto Rico did not become integrated automatically into United States when Spain ceded its possession by treaty); <u>see also</u> <u>Dorr v. United States</u>, 195 U.S. 138, 142-43 (1904) (announcing principle of incorporated and unincorporated territories); <u>U.S. Lines Co. v. Eastburn Marine Chem. Co.</u>, 221 F. Supp. 881, 883 (S.D.N.Y. 1963) ("Normally the word 'territories' is used as including only the portions of the United States territorial possessions which are organized and exercising governmental functions <u>under [an] act of Congress</u>" (emphasis added)).  However, the mere possession of a territory, even by treaty, does not translate automatically into an exercise of sovereign authority.  <u>See</u> <u>Porter v. United States</u>, 496 F.2d 583, 588 (Ct. Cl. 1974) (explaining that United States' acting as administering power over Pacific Trust Territory does not constitute exercising sovereign authority).

Furthermore, the decisional power concerning the exercise of sovereignty over a territory of the United States, incorporated or unincorporated, is a function that the U.S. Constitution grants solely to Congress.  <u>See</u> U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States."); <u>Boumediene v. Bush</u>, 553 U.S. 723, 753 (2008) (explaining that, in contexts other than extraterritorial application of suspension clause, "the Court has held that questions of sovereignty are for the political branches to decide"); <u>Dorr</u>, 195 U.S. at 143 ("Until Congress shall see fit to incorporate territory ceded by treaty into the United States, we regard it as settled . . . that the territory is to be governed under the power existing in Congress to make such laws for such  territories . . . .").  First, however, a territory must be "acquired" by the United States—and not merely occupied.

In <u>Boumediene</u>, trumpeted by plaintiff, Justice Kennedy distinguished between de jure and de facto sovereignty, explaining that "it is not altogether uncommon for a territory to be under the <em>de jure</em> sovereignty of one nation, while under the plenary control, or practical sovereignty, of another."  553 U.S. at 754.  Plaintiff seizes on this distinction to argue that

the United States exercised de facto sovereignty over Iraq.  See Transcript of Proceedings, [Doe] v. United States, No. [deleted], at 41-44 (Fed. Cl. Sept. 2, 2010) ("Tr.").

The Court in Boumediene rejected the Government's argument that, "as applied to noncitizens, the Constitution necessarily stops when *de jure* sovereignty ends," 553 U.S. at 755, and concluded that "by virtue of its complete jurisdiction and control," id., over the United States Naval Station at Guantanamo Bay, Cuba, the United States "maintains *de facto* sovereignty over this territory" while Cuba retains de jure sovereignty, id.; see also id. at 753 ("Under the terms of the 1934 Treaty, however, Cuba effectively has no rights as a sovereign until the parties agree to modification of the 1903 Lease Agreement or the United States abandons the base."). Any factual counterpart, however, is absent in the present controversy. Moreover, while the Court explained that questions regarding the extraterritorial application of the Constitution have turned on objective factors and practical considerations, see id. at 764, the Court's holding was specific to the extraterritorial application of the suspension clause, id. at 766 (explaining three factors relevant to reach of suspension clause).  Nothing in Boumediene suggests that the Court intended its holding to broadly apply to the Bill of Rights or to the takings clause, in particular. 19/

Unlike the unique "complete jurisdiction and control" exercised by the United States over Guantanamo Bay—which is provided for by treaty—or other United States territories, at no time was Iraq "acquired" by the United States or any of its Coalition partners.  Id. at 755.  Nor can plaintiff point to any UN resolution or act of Congress that recognizes the United States or the CPA as the sovereign power in Iraq.  See S.C. Res. 1483, at 1 (reaffirming "the sovereignty and territorial integrity of Iraq").  Plaintiff cannot escape the reality that, while the CPA indeed may have exercised governmental and administrative functions, that role does not translate into an exercise of sovereignty because the CPA was a multinational organization.  See Laudes Corp. v. United States, 84 Fed. Cl. 298, 300 (2008) (finding CPA was a "temporary governmental entity established in April 2003 by the coalition partners, principally the United States and the United Kingdom" and holding that United States was not subject to breach of contract suits for acts of CPA (emphasis added)); see also Best v. United States, 292 F.2d 274, 279 (Ct. Cl. 1961) (holding that German

_____

19/  This court concurs with defendant's position at oral argument that the facts of the present controversy are more akin to those confronted by the Court in Eisentrager, where the defendants served their punishment at Landsberg Prison during the Allied military occupation of Germany, which the Court held was not within its territorial jurisdiction.  See Eisentrager, 339 U.S. at 766, 768.  As explained by the Court later in Boumediene, Landsberg Prison was not an area within which the United States exercised complete and total control.  See Boumediene, 553 U.S. at 762 (noting that United States lacked both de jure sovereignty and plenary control over Landsberg Prison); cf. Laudes Corp. v. United States, 84 Fed. Cl. 298, 300 (2008).

contractor could not bring breach of contract claim against United States arising out of contract with U.S. Army in Germany because U.S. Army was acting as agent of Allied High Commission for Germany, an international body, not United States).  As defendant has shown, the  documents themselves cited by plaintiff attest to the multinational composition of the CPA.  See S.C. Res. 1483, at 2 (recognizing that nations comprising the CPA acted as "occupying powers under unified command," and calling upon "the Authority, . . . to promote the welfare of the Iraqi people through the effective administration of the territory" (emphasis added)).  Nor did Iraq ever come under the "complete jurisdiction and control" of the United States the way Guantanamo Bay did following the end of the Spanish American War.  Boumediene, 553 U.S. at 755; cf. Al Maqaleh v. Gates, 605 F.3d 84, 97 (D.C. Cir. 2010). 20/

In fact, defendant points to actions taken by the United States that persuasively demonstrate that neither Congress nor the President ever intended the United States to exercise sovereign power in Iraq.  In April 2003 Congress enacted the Emergency Wartime Supplemental Appropriations Act, Pub. L. No. 108-11, § 1503, 117 Stat. 559, 579 (2003) (the "EWSAA"), which authorized the President to waive any application to Iraq of the exception to the Foreign Sovereign Immunity Act's, 28 U.S.C. §§ 1602-11 (2006), grant of sovereign immunity for lawsuits in federal court for state sponsors of terrorism, id. § 1605(a)(7).  President Bush exercised that authority in May 2003.  See 68 Fed. Reg. 26,459.  In Beaty the Supreme Court explicitly recognized the effect of the legislation when President Bush exercised his authority thereunder to make § 1605(a)(7) inapplicable to Iraq—namely, the full restoration of Iraq's sovereign immunity.  129 S. Ct. at 2189, 2194.

Plaintiff characterizes defendant's argument that the EWSAA waiver evidences the United States' intent to recognize the sovereignty of Iraq as a "non sequitur."  Pl.'s Br. filed June 21, 2010, at 14.  Plaintiff advances the notion that the EWSAA waiver "appears to be an essential element of a U.S. plan to effectuate unfettered control over Iraqi sovereignty," id. at 15, because at the time the President issued the waiver the "United States was the sovereign government of Iraq," id. at 14 (emphasis omitted).  In other words, plaintiff offers—as evidence that the United States exercised sovereignty over Iraq—a law passed by Congress and implemented by the President that reinstated Iraq's sovereign immunity from suits in a United States federal court.  It is plaintiff's construction of the EWSAA and Beaty that constitutes a non-sequitur, and a significant one.  If plaintiff's theory were correct and

_____

20/  To the extent that plaintiff rests his argument on de facto sovereignty, this court does not read Boumediene as replacing de jure sovereignty with de facto sovereignty.  See Boumediene, 553 U.S. at 762 (rejecting a "formalistic, sovereignty-based test" for determining reach of suspension clause); see also Al Maqaleh, 605 F.3d at 95 ("We therefore reject the proposition that Boumediene adopted a bright-line test with the effect of substituting de facto for de jure in the otherwise rejected interpretation of Eisentrager.").

the United States was, through the CPA, exercising sovereign authority over Iraq at that time, reinstating Iraq's sovereign immunity would be redundant. The Supreme Court's construction of the EWSAA in Beaty forecloses this possibility. See 129 S. Ct. at 2194 (holding that federal district court was divested of jurisdiction to hear suit against Iraq stemming from crimes committed by regime of Saddam Hussein when President Bush "exercised his authority to make § 1605(a)(7) inapplicable with respect to Iraq").

The court is equally unpersuaded by plaintiff's argument that plaintiff need not show substantial connections to the United States because there was a "unique relationship" between the United States and Iraq. Plaintiff's argument is premised on a misunderstanding of Juda. Beyond this, plaintiff cites no other authority.

First, Juda does not stand for the broad proposition that an exercise of sovereign power by the United States in a foreign jurisdiction occupied pursuant to a UN resolution creates a "unique trust relationship," thereby extending to that jurisdiction fundamental constitutional rights. See Pl.'s Br. filed June 21, 2010, at 15, 17-19. Plaintiff's contention that "[t]here is no meaningful distinction between the facts in Juda and those presented in the instant case," is belied by what that lengthy opinion actually says, id. at 24. Second, as a decision of the United States Claims Court, Juda may be persuasive, but it is not binding precedent on the Court of Federal Claims. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) (United States Court of Federal Claims is bound by precedent of the Supreme Court, the Federal Circuit, and the Court of Claims).

The court in Juda considered a takings claim brought by residents of the Marshall Islands. See 6 Cl. Ct. at 441. As outlined by Judge Harkins, the Marshall Islands had a unique political relationship with the United States. The Marshall Islands are a part of Micronesia, formerly a United Nations Trust Territory administered by the United States. The component parts of the Trust Territory of the Pacific Islands (the "Trust Territory") included the Marshall, Caroline, and Mariana island chains. Id. at 444. Prior to the Second Wold War, Japan administered the islands under a League of Nations mandate. Subsequently, they came under United States military occupation in 1944. Id. Following the end of the war, the United States "was designated 'administering authority' over the Trust Territory pursuant to an agreement ratified by the United Nations Security Council on April 2, 1947, and approved by Congressional joint resolution on July 18, 1947." Id. at 444. The United States governed the Trust Territory through the Executive Branch until 1954, when Congress provided by statute:

> Until Congress shall further provide for the government of the Trust Territory of the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil administration of the Trust Territory shall continue to be vested in such person or persons and shall be exercised in such a manner

and through such agency or agencies as the President of the United States may direct or authorize.

48 U.S.C. § 1681(a).  In 1969 the United States and the inhabitants of the Trust Territories began negotiations to establish constitutional self-government.  Juda, 6 Cl. Ct. at 444. During 1982 and 1983, a Compact of Free Association was entered into among the United States, the government of the Federated States of Micronesia, and the Republic of the Marshall Islands.  Id.

The takings claim at issue in Juda had its genesis in the destruction of several of the Marshall Islands following a series of nuclear tests during the Cold War's infancy.  Judge Harkins explained the utter devastation wrought by the nuclear testing:

> The United States detonated 23 hydrogen and atomic bombs on Bikini Atoll between June 30, 1946, and July 22, 1958. Two tests were air drops, two devices were detonated under water, and other devices were detonated on anchored barges.  The nuclear tests caused severe destruction.  Radioactive mud was dumped on the islands and into the lagoon; coral, algae and shellfish on the reef were destroyed; and some of the islands were annihilated.  In 1956, the Atomic Energy Commission (AEC) reported that all of the islands had received in varying degrees the resultant radioactive fusion and activation products.

Id. at 447.  Consequently, the inhabitants of these islands had to be removed and permanently resettled.  Judge Harkins described other effects of the testing: "permanent resettlement with substantial relocation hardships of some inhabitants; exposure to high levels of radiation of some inhabitants; and widespread contamination from radioactivity that renders some islands unuseable by man for indefinite future periods."  Id. at 443.  Thus, it is in this context that Judge Harkins considered whether the Fifth Amendment's compensation clause extended to the Trust Territory, which never was considered a territory or possession of the United States, either incorporated or unincorporated, and over which the United States never claimed sovereignty.  See id. at 457.  Judge Harkins concluded in the affirmative:

> During the course of the program to test atomic weapons, the United States created a relationship with plaintiffs that exceeded in both nature and degree the relationship normally taken with a "foreign" country or by a trustee charged to protect the inhabitants against the loss of their lands and resources and to protect their health.  The United States has accorded the people of the Marshall Islands benefits which far surpass the benefits normally extended to citizens of foreign nations.  In addition, in 48 U.S.C. § 1681, Congress has acted with respect to these plaintiffs and their rights.  Congress has ratified the

powers conferred upon the President and the actions taken to administer the Trust Territory.

Id. at 458. 21/

_____

21/ Other developments following Juda militate against extending its holding beyond the particular facts of that case. Juda's extraterritorial application of the Fifth Amendment was never considered on appeal by the Federal Circuit. Juda and the other Trust Territory cases were consolidated by the Federal Circuit in People of Enewetak v. United States, 864 F.2d 134 (Fed. Cir. 1988). The Federal Circuit dismissed the appeal with prejudice "upon the unopposed motion of claimants, following the enactment of special legislation which appropriated funds for the benefit of the People of Bikini." Id. at 135 n.1. More importantly, this court has reason to doubt Juda's constitutionality.

Prior to holding that the Marshall Islanders could invoke the Fifth Amendment, Judge Harkins discussed the Supreme Court's holdings in the "Insular Cases," which limited the extraterritorial application of various provisions of the Bill of Rights to United States territories in the absence of congressional action. Juda, 6 Ct. Cl. at 457 (citing Torres v. P.R., 442 U.S. 465, 469 (1979); Balzac v. P.R., 258 U.S. 298 (1922); Dorr, 195 U.S. 138). Juda distinguished these cases on grounds that the Insular Cases "were concerned with territories that belonged to the United States as a result of cession by treaty, whereas the Marshall Islands are administered pursuant to a United Nations Trusteeship Agreement." Id. This distinction does not impress this court as a sufficient ground to disregard otherwise applicable precedent of the Supreme Court. Juda also noted that not all laws of the United States applied to the Marshall Islands. See id. at 441 (explaining that Freedom of Information Act, the Federal Tort Claims Act, various provisions of Federal Income Tax Code, National Environmental Policy Act and Administrative Procedures Act cannot be invoked or are not applicable to inhabitants of Trust Territories under Trust Agreement).

In dicta Judge Harkins explained the *ratio decidendi* underlying his holding with respect to the Fifth Amendment: "All of the restraints of the Bill of Rights are applicable to the United States wherever it has acted. The concept that the Bill of Rights and other constitutional protections against arbitrary government are to be applied selectively on a territorial basis cannot be justified in the 1980s." Id. at 458. Yet, the Supreme Court subsequently in Verdugo-Urquidez rejected this "global view" of the Constitution:

> The global view taken by the Court of Appeals of the application of the Constitution is also contrary to this Court's decisions in the *Insular Cases,* which held that not every constitutional provision applies to governmental activity even where the United States has sovereign power. In *Dorr,* we declared the general rule that in an unincorporated territory-one not clearly

Nothing in Judge Harkins' reasoning leads to the conclusion that the Fifth Amendment extended to the Marshall Islands because the United States "exercised comprehensive sovereignty over the occupied territory and thereby created a unique relationship between itself and the occupied territory." Pl.'s Br. filed June 21, 2010, at 24. Indeed, the court is at an utter loss to understand how plaintiff could reach this conclusion. Plaintiff is correct that Juda's holding with respect to the Fifth Amendment was grounded on the "relationship" found by the court between the United States and the Marshall Islanders, but that relationship was forged in the United States' program of atomic testing, not notions of sovereignty. The relationship established with the Marshall Islanders was "unique" in that it "exceeded in both nature and degree the relationship normally taken with a 'foreign' country or by a trustee charged to protect the inhabitants against the loss of their lands and resources and to protect their health." Juda, 6 Cl. Ct. at 458 (emphasis added). First, the United States dropped atomic bombs on the very territories for which it had agreed to act as trustee. Second, Congress took specific action to "accord[] the people of the Marshall Islands benefits which far surpass the benefits normally extended to citizens of foreign nations." Id. (emphasis added) (explaining that "Congress [had] acted with respect to these plaintiffs and their rights" in passing 48 U.S.C. § 1681 and by "ratif[ying] the powers conferred upon the President and the actions taken to administer the Trust Territory").

Plaintiff has failed to articulate any congressional action taken to bestow the Iraqi people with "benefits" that are comparable to those listed in Juda or that are not otherwise unique in relation to other foreign powers. The use of force in Operation Iraqi Freedom is not remotely comparable to the atomic weapons testing that is the heart of Juda. Plaintiff's central argument that "the Juda court determined that the United States had *exercised*

---

21/ (Cont'd from page 37.)

destined for statehood-Congress was not required to adopt "a system of laws which shall include the right of trial by jury, and that *the Constitution does not, without legislation and of its own force, carry such right to territory so situated*." Only "fundamental" constitutional rights are guaranteed to inhabitants of those territories. If that is true with respect to territories ultimately governed by Congress, respondent's claim that the protections of the Fourth Amendment extend to aliens in foreign nations is even weaker. And certainly, it is not open to us in light of the *Insular Cases* to endorse the view that every constitutional provision applies wherever the United States Government exercises its power.

Verdugo-Urquidez, 494 U.S. at 268-69 (citations omitted). Following Verdugo-Urquidez, the continuing validity of Judge Harkins' broad extraterritorial application of the Bill of Rights lost traction. See Ashkir v. United States, 46 Fed. Cl. 438, 444 n.12 (2000).

*sovereign power* over the Marshall Islands and thereby extended to its inhabitants the protections of the Takings Clause" is simply wrong. Pl.'s Br. filed June 21, 2010, at 16. The court in <u>Juda</u> was careful to explain that its holding was not based on any exercise of sovereign power. <u>See</u> <u>Juda</u>, 6 Cl. Ct. at 457 (explaining that under United Nations trustee system a "trustee is not the sovereign of the Trust Territory"; rather, sovereignty "rests in the people of Micronesia and is <u>held in trust</u> for them by the administrating power" (emphasis added) (citing <u>Porter</u>, 496 F.2d at 588 n.4)). Actions taken by the United States that the court found "exceeded in both nature and degree the relationship normally taken . . . <u>by a trustee</u>" were not undertaken pursuant to any exercise of sovereign power. <u>Id.</u> at 458 (emphasis added). Rather, any action taken by the United States towards the Marshall Islands was undertaken pursuant to authority granted by the Trustee Agreement, a treaty ratified by Congress. The United States has entered into no such agreement with respect to Iraq. 22/ Congress's allocation of funds to the CPA is not comparable to its explicit ratification of the Trust Agreement. <u>Juda</u> thus is irrelevant to plaintiff's takings claim. Finally, the Supreme Court's refusal to "endorse the view that every constitutional provision applies wherever the United States Government exercises its power" closes the door on plaintiff's sovereignty argument. <u>Verdugo-Urquidez</u>, 494 U.S. at 268-69.

### 3) <u>Substantial connection to the United States</u>

The United States' purported exercise of sovereignty over Iraq does not create a unique relationship between either the United States and Iraq or the United States and plaintiff, and it does not grant plaintiff standing to bring his takings claim in the Court of Federal Claims. Accordingly, plaintiff must establish that he possesses substantial

---

<u>22/</u>  Plaintiff points to an appropriation resolution, Pub. L. No. 108-106, as evidence that Congress ratified the CPA's mission to "exercise sovereign authority in the relief and reconstruction of Iraq." <u>See</u> Pl.'s Br. filed June 21, 2010, at 13; <u>id.</u> at 20-21. The Emergency Wartime Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004, Pub. L. No. 108-106, § 2101, 117 Stat. 1209, 1225 (2003), provides:

> [F]unds appropriated under this heading shall be apportioned on to the Coalition Provisional Authority in Iraq (in its capacity as an entity of the United States Government), the Department of State, the Department of Health and Human Services, the Department of the Treasury, the Department of Defense, and the United States Agency for International Development.

<u>Id.</u>  Defendant responds that Congress's appropriating funds to an entity cannot be equated to Congress's specifically directing how a territory will be governed, as it did in 48 U.S.C. § 1681. <u>See</u> Def.'s Br. filed July 12, 2010, at 13. The court agrees with defendant's assessment.

connections to the United States in order to possess standing to bring his takings claim. <u>Atamirzayeva</u>, 524 F.3d at 1329. Plaintiff asserts that he maintains such connections because "in the context of its exercise of comprehensive sovereign authority the Defendant initiated and maintained sufficient significant contacts with Plaintiff to satisfy the substantial connections test articulated in [<u>Verdugo-Urquidez</u>, 494 U.S. at 271]." Pl.'s Br. filed June 21, 2010, at 25.

Plaintiff vouchsafes in his post-argument affidavit that the following events—unconnected to the occupation of his home—establish his connections with the United States: (1) A [deleted] (known as "Mr. [deleted]" and operating out of the [deleted]) telephoned plaintiff and then later met with plaintiff to recruit his help prior to the commencement of Operation Iraqi Freedom, Pl.'s Br. filed June 21, 2010, at 28-29; Mr. [deleted] promised that the United States would compensate plaintiff for his assistance and make him whole for any damages he sustained, <u>id.</u> at 29; (2) following the invasion and establishment of the CPA, from 2003 through 2004, plaintiff had meetings in Iraq with [deleted]; during one meeting Mr. [deleted] gave plaintiff [deleted] to use in support of the United States, and, at some point in 2004, Mr. [deleted] advised plaintiff and his [deleted] to flee immediately due to death threats made against plaintiff by Al Qaeda, <u>id.</u> at 29; and (3) from 2004 through 2008, plaintiff met with "many different [deleted] officers and embassy officials in [deleted]," who paid plaintiff [deleted] for his assistance, and, in 2007, the United States sent a letter to [deleted] authorities requesting that plaintiff's [deleted], <u>id.</u> at 29-30. <u>See</u> [Doe] Aff. ¶ 2 (averring as fact assertions of counsel in plaintiff's reply brief); <u>see also</u> <u>supra</u> note 1.

Plaintiff also argues that the circumstances involved in the alleged taking reinforce his connections with the United States. According to plaintiff, the Gillette Memorandum manifests "Defendant's intention to voluntarily establish an ongoing interaction with Plaintiff." Pl.'s Br. filed June 21, 2010, at 30. Finally, plaintiff proposes that the fact that his claim was processed under the FCA shows defendant's "continued . . . extensive voluntary contacts" with plaintiff. <u>Id.</u>; <u>see also</u> [Doe] Aff. ¶ 2.

Taking all of these pieces into consideration, the court concludes that the circumstances that underlie plaintiff's takings claim do not satisfy the <u>Verdugo-Urquidez</u> substantial connections test. Otherwise, the test would be "eviscerated" because "all alien plaintiffs asserting a takings claim would necessarily meet it." Def.'s Br. filed July 12, 2010, at 16. Plaintiff must show connections to the United States independent of his claim. The text of the Supreme Court's opinion in <u>Verdugo-Urquidez</u> supports this ruling.

In <u>Verdugo-Urquidez</u> the Court held that the Fourth Amendment's prohibition against unreasonable searches did not apply to the warrantless search by agents of the United States Drug Enforcement Administration (the "DEA") of properties located in Mexico and owned

by Mr. Verdugo-Urquidez, a Mexican citizen, after Mr. Verdugo-Urquidez had been charged by the United States for various narcotics trafficking offenses.  494 U.S. at 262.  In its consideration of the extraterritoriality of the Constitution, the Court rejected the "global view taken by the Court of Appeals of the application of the Constitution," id. at 268, which it characterized as "the view that every constitutional provision applies wherever the United States Government exercises its power," id. at 269.  The Court also distinguished a series of cases holding that certain constitutional rights were applicable to aliens because those cases established "only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." Id. at 270-71 (citing, inter alia, Russian Volunteer Fleet, 282 U.S. 481 (extending Fifth Amendment's just compensation clause to seizure of vessels owned by Russian corporation but located in United States)).

The Court held that Mr. Verdugo-Urquidez "had no previous significant voluntary connection with the United States." Id. at 271.  Although the Court did not expound on this test, it rejected the view that someone who was present in the United States lawfully but involuntarily, i.e., an extradited prisoner, can substantiate any connection to the United States.  Id.  The Court also distinguished INS v. Lopez-Mendoza, 468 U.S. 1032 (1984) (holding Fourth Amendment's exclusionary rule applies to civil deportation proceedings), as a case involving illegal aliens who were present in the United States "voluntarily and presumably had accepted some societal obligation; but [Mr. Verdugo-Urquidez] had no voluntary connection with this country that might place him among 'the people' of the United States." Verdugo-Urquidez, 494 U.S. at 273.

In Atamirzayeva, 524 F.3d at 1328, the Federal Circuit considered the question of substantial connections in light of the holding in Turney v. United States, 115 F. Supp. 457, 464 (Ct. Cl. 1953).  The Court of Claims in Turney applied the takings clause to a claim brought by a Philippine corporation for the taking of property in the Philippines.  The Atamirzayeva court recognized that Turney was in tension with Verdugo-Urquidez and declined to interpret Turney as having established "a blanket rule that the Fifth Amendment protects the foreign property of citizens of every foreign country without regard to their connections to the United States." 524 F.3d at 1328.  Instead, the court limited Turney's holding to the facts of that case.  Id.  Atamirzayeva involved a takings claim brought by an Uzbeki national who alleged that her restaurant, which was located next to the United States Embassy in Tashkent, Uzbekistan, was razed by Uzbeki officials allegedly at the behest of the United States Embassy.  Id. at 1321.  The Federal Circuit distinguished Turney on the ground that the alien corporation that brought the claim in Turney had "three significant connections to the United States." Id. at 1238.  The court explained:

First, the corporation had been formed by two United States citizens. Second, the corporation received its ownership interest in the surplus property by

assignment from those United States citizens.  Third, after liquidation of the corporation, a United States citizen was appointed as the liquidating trustee and the plaintiff in the Court of Claims action.

Id.   The Federal Circuit contrasted these connections to those of the plaintiff in Atamirzayeva, noting that she had not "pleaded any relationship, business or otherwise, with the United States.  As pleaded, her only connections with the United States are that her cafeteria was adjacent to the U.S. Embassy and that embassy officials directed the seizure." Id. 23/ Because these connections did not constitute a significant connection under Verdugo-Urquidez, the Atamirzayeva court affirmed the trial court's entry of judgment on the pleadings.  Id. at 1329.

Based on the foregoing analysis, the court concludes that, assuming the truth of plaintiff's assertions regarding his contacts and payments by [deleted], they are not sufficient to establish plaintiff's substantial connections to the United States.  Plaintiff is a nonresident alien who alleges a taking without compensation of property located in Iraq by the United States military.  In order to have standing to bring such a claim in federal court, plaintiff must establish that he has come within the territory of the United States and developed substantial connections to this country, which he has not perfected.  Accordingly, plaintiff lacks standing to bring his Fifth Amendment takings claim. 24/

––––––––––––––––––––

23/  Plaintiff's allegation of a business relationship and affidavit averring its terms are discussed further in connection with plaintiff's contract claims in part III of this opinion.

24/  The court has considered defendant's third argument in favor of dismissal—that plaintiff has not pled a valid inverse takings claim.  As explained in defendant's motion to dismiss, Def.'s Br. filed Feb. 5, 2010, at 20-24, plaintiff's amended complaint does not satisfy the dual requirements for inverse condemnation as set forth in Cary, 552 F.3d at 1377 (explaining that inverse condemnation claimant must satisfy two-part test of causation and appropriation).  Having already concluded that plaintiff has not brought a valid takings claim and, alternatively, that plaintiff lacks standing to bring such a claim, the court need not dwell on this issue.  However, because the parties discussed Cary at length at oral argument, the court will explain briefly why it agrees with defendant that plaintiff cannot satisfy the causation prong.

Plaintiff purports to satisfy Cary's causation prong by showing that the U.S. military forces intentionally took possession of plaintiff's home and intentionally destroyed the protective wall.  See id. ("[To satisfy] the causation prong, it must be shown that 'the government intend[ed] to invade a protected property interest or [that] the asserted invasion [was] the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" (alteration in original) (quoting Ridge Line,

III.  Plaintiff's contract claim and superseding jurisdictional bar to considering it

Plaintiff alleges breach of an express or an implied-in-fact contract based on his purported agreement with an "authorized representative of the United States" that, in exchange for his support of United States military action in Iraq, the United States would compensate plaintiff for any inconvenience or damage sustained during such military action. Am. Compl. ¶ 13.  Plaintiff contends that he accepted this offer and acted to support the United States in Iraq.

Defendant seeks dismissal of Count II of plaintiff's amended complaint alleging breach of contract under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted.  According to defendant, plaintiff failed to allege the elements of either breach of an express or an implied-in-fact contract.  No mutual intent to contract with the United States was pleaded, and an ambiguous promise of future compensation cannot suffice to establish consideration.  Also, defendant advances that plaintiff cannot establish that the alleged "authorized representatives" of the United States  possessed actual authority to bind the United States.  Def.'s Br. filed July 12, 2010, at 20.

------

24/ (Cont'd from page 42.)

Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003))).  Plaintiff misreads the requirement of intent.  The invaded property interest for which plaintiff seeks compensation was the destruction of his house and the wall, not just the wall.  But plaintiff alleges that the only property interest intentionally invaded by U.S. military forces was the wall.  No allegation is pressed that U.S. military forces intended that plaintiff's house be destroyed by insurgents when they abandoned it.  See Cary, 552 F.3d at 1377 ("To prevail, the landowners must first show that the government intended to invade a protected property interest.  Clearly, the government did not intend to take the landowners' land by use of an uncontrolled wildfire . . . .").  Nor can plaintiff show that the insurgents' destruction of his house was the direct, natural, or probable result of the admittedly authorized destruction of the wall.  Unlike the flooding at issue in Cotton Land Co. v. United States, 75 F. Supp. 232, 233-34 (Ct. Cl. 1948), the destruction of plaintiff's house by insurgents was not the "natural progression of a chain of events occurring in a natural order without an intervening activity to break the chain of causation," Cary, 552 F.3d at 1378 ("As the court in Cotton Land noted, further study would have predicted the flood, when it would occur, and where it would occur." (citing 75 F. Supp. at 234)).  Rather, like the fire set by the hunter in Cary, 552 F.3d at 1375, the insurgents' destruction of the house was an "intervening cause which broke any perceived chain of causation" between the Marine's destruction of the wall and the loss of the surrounding property, id. at 1378; cf. Avery v. United States, 330 F.2d 640, 645 (Ct. Cl. 1964).

Plaintiff rejoins that his allegations of partial performance by the United States on its agreement with plaintiff are sufficient evidence that government agents possessed actual authority to contract on behalf of the Government. Specifically, plaintiff cites Mr. [deleted]'s warning to plaintiff and his [deleted] about the Al Qaeda threat against them; the [deleted] payments made to plaintiff; and a letter sent in 2007 by the United States to [deleted] authorities requesting an [deleted]. See Pl.'s Br. filed June 21, 2010, at 52-53. 25/ Plaintiff importunes that the United States' partial performance "of its agreement with Plaintiff . . . could only occur if the persons who purported to make the agreement had the requisite authority." Id. at 53. Plaintiff also contends that the Gillette Memorandum constituted written confirmation of the oral agreement that the United States would compensate plaintiff for damage to his property caused by the military action. See id. at 53-54. 26/

---

25/ Plaintiff moves for leave to amend his pleading to assert these facts. Pl.'s Br. filed June 21, 2010, at 53 n.52. Defendant opposes, Def.'s Br. filed July 12, 2010, at 15 n.4, with the reasonable argument that amendment would be futile because the new averments would not survive defendant's motion to dismiss. See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V., 464 F.3d 1339, 1354-55 (Fed. Cir. 2006) ("When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion."); Mitsui Foods, Inc. v. United States, 867 F.2d 1401, 1403-04 (Fed. Cir. 1989) (holding no abuse of discretion when lower court denied motion to amend complaint on grounds of futility of amendment when proposed amendment would not affect judgment). At this stage in the litigation plaintiff offers little more than "'conclusory suggestion[s] that additional discovery might turn something up [sic] that would support' the new claim." Kemin Foods, 464 F.3d at 1355 (quoting Wilson v. Am. Trans Air, Inc., 874 F.2d 386, 393 (7th Cir. 1989)). Indeed, the court concludes that plaintiff's claims, bolstered by the averments of counsel and plaintiff's September 21, 2010 affidavit, see supra note 1, still would not constitute a viable claim. Even if the identities of the alleged individuals were disclosed, plaintiff has not suggested "sufficient factual matter to state a claim on its face," Twombly, 550 U.S. at 555, concerning authority to contract. This issue is explicated further in this section.

26/ Plaintiff argues that

the court should not assume that it was mere serendipity that Maj. Gillette reiterated exactly the promises made to Plaintiff by his [deleted]. There is no evidence that the promises contained in the Gillette Memorandum were made to anyone else in the Iraq theater of operations. . . . It is equally plausible that Defendant was using its military employees to reconfirm authorized promises

1. The Totten bar 27/

In 1875 the Supreme Court issued the clarion call that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." Totten v. United States, 92 U.S. 105, 107 (1875). Accordingly, the Court held that this principle applies to bar "cases of contracts for secret services with the government, as the existence of a contract of that kind is itself a fact not to be disclosed." Id. The Supreme Court in Totten considered a breach of contract claim brought in the Court of Claims by the administrator of the estate of William A. Lloyd. Id. at 105. During the Civil War, President Lincoln entered into a contract with Mr. Lloyd pursuant to which Mr. Lloyd would engage in espionage services behind Confederate lines and then report back to President Lincoln. Id. at 105-06. Mr. Lloyd was to be paid $200.00 per month for his services. Id. at 106. The Court noted that its objection was not to the contract, "but to the action upon it in the Court of Claims." Id. The Court expounded about the need to keep secret the nature of the contract between Mr. Lloyd and the Government:

---

26/ (Cont'd from page 44.)

previously made by its intelligence employees in order to protect its relationship to a vital intelligence asset.

Pl.'s Br. filed June 21, 2010, at 54; see also Tr. at 78-79 (raising same argument). The court considers this claim in its discussion of the Totten bar.

27/ Plaintiff asserts that the court raised *sua sponte* the issue of whether Tenet v. Doe, 544 U.S. 1 (2005), and Totten v. United States, 92 U.S. 105 (1875), have any jurisdictional impact over plaintiff's contract claim. See Pl.'s Br. filed Sept. 28, 2010, at 1. Plaintiff's statement requires clarification. Totten was first brought to the court's attention through the Federal Circuit's discussion of the state secrets privilege in Monarch Assurance P.L.C. v. United States, 244 F.3d 1356, 1358-60 (Fed. Cir. 2001), the latter case having been cited by defendant in two separate briefs. See Def.'s Br. filed July 12, 2010, at 21; Def.'s Br. filed Feb. 5, 2010, at 25. Both Monarch and Totten were discussed extensively at oral argument. See Tr. at 24-27, 29-30, 74-77. The court subsequently discovered that the Supreme Court had reaffirmed Totten in Tenet, 543 U.S. at 8, the relevancy of which is discussed further in this section. Because Tenet was neither discussed at oral argument nor the subject of briefing by the parties, the court ordered supplemental briefing on Tenet's and Totten's precedential impact on the Court of Federal Claims' jurisdiction over plaintiff's contract claim. See Order entered Sept. 16, 2010.

> The service stipulated by the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. Both employer and agent must have understood that the lips of the other were to be for ever [sic] sealed respecting the relation of either to the matter. This condition of the engagement was implied from the nature of the employment, and is implied in all secret employments of the government in time of war, or upon matters affecting our foreign relations, where a disclosure of the service might compromise or embarrass our government in its public duties, or endanger the person or injure the character of the agent.

Totten, 92 U.S. at 106. The Court concluded that the likelihood of detrimental public exposure inherent in any lawsuit involving such activities was too great to permit such a suit from being heard. Id. at 106-07. "The secrecy which such contracts impose precludes any action for their enforcement. The publicity produced by an action would itself be a breach of a contract of that kind, and thus defeat a recovery." Id. at 107.

The Court in Tenet v. Doe, 544 U.S. 1, 7-11 (2005), had occasion to re-examine Totten at length and affirmed its holding. Tenet involved two former Cold War spies who brought suit against the United States, alleging that the CIA broke its promise to provide financial support in exchange for their espionage services. Id. at 5. The lower court rejected the Government's claim that the Totten bar prohibited the suit. Id. at 5-6. After reviewing Totten, the Court concluded that the lower court "was quite wrong in holding that Totten does not require dismissal of respondents' claims." Id. at 8. The Court held that Totten bars not only contract claims, it "precludes judicial review in cases . . . where success depends upon the existence of . . . a secret espionage relationship with the Government." Id.; see also id. at 9 (explaining that the state secrets privilege announced in United States v. Reynolds, 345 U.S. 1, 6-7 (1953), "in no way signaled our retreat from Totten's broader holding that lawsuits premised on alleged espionage agreements are altogether forbidden"); cf. Mohamed v. Jeppesen Dataplan, Inc., 614 F.3d 1070, 1078 n.4 (9th Cir. 2010) ("Tenet also made clear that application of the Totten bar does not require a formal assertion of the state secrets privilege by the government that meets the procedural requirements explained in Reynolds . . . ."). Thus, where a claim's "success depends upon the existence of . . . a secret espionage relationship with the Government," Tenet, 544 U.S. at 8, the Totten bar stands as a "threshold question" that the court must consider before proceeding to the merits of the claim, id. at 6 n.4 (explaining that "the unique and categorical nature of the Totten bar" is "designed not merely to defeat the asserted claims, but to preclude judicial inquiry" altogether); see also id. at 12 (Scalia, J., concurring) ("As applied today, the bar of Totten is a jurisdictional one.").

Consequently, because the court's jurisdiction depends on the result of its Totten analysis, the court must proceed with this analysis before proceeding to defendant's RCFC

12(b)(6) motion, which goes to the merits of plaintiff's contract claim. "It is firmly established . . . that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case." Steel, 523 U.S. at 88-89 (explaining that jurisdiction must be established before proceeding to merits of case); see also Clark v. United States, 322 F.3d 1358, 1363 (Fed. Cir. 2003) ("Federal jurisdiction is generally determined at the outset of a case."); compare Univ. of Pittsburgh v. Varian Med. Sys., Inc., 569 F.3d 1328, 1332 (Fed. Cir. 2009) ("A dismissal for lack of standing is jurisdictional and is not an adjudication on the merits."), with Litecubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1361 (Fed. Cir. 2008) ("Thus, a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction."). 28/

The court concludes that plaintiff has alleged a contract involving espionage services on behalf of the United States and, therefore, the Totten bar applies. Plaintiff claims that the Totten bar does not apply because neither plaintiff's alleged contract nor its subject matter were "matter[s] of state secret." Pl.'s Br. filed Sept. 28, 2010, at 2. Further, to the extent plaintiff's relationship with defendant was "ever a matter of state secret, the existence of that relationship and the terms of Plaintiff's compensation have been publicly acknowledged by Defendant." Id. Both assertions are without merit.

Plaintiff stresses that he does not allege that the contract was for espionage or intelligence services. Rather, he "merely . . . agreed to provide assistance in support of Defendant's mission in Iraq." Id. at 2. "Although the Government representatives are

---

28/  Defendant's supplemental brief explains that, even though Tenet and Totten require dismissing plaintiff's claim for lack of jurisdiction, defendant did not deem it necessary to raise Totten and Tenet in prior briefs because plaintiff failed to plead sufficient facts establishing a contract. Def.'s Br. filed Sept. 27, 2010, at 4 n.2. Defendant "confuses the issue of jurisdiction with the question of whether [plaintiff] can prevail on the merits." Clark, 322 F.3d at 1363; see also Arbaugh v. Y & H Corp., 546 U.S. 500, 510-11 (2006) (cautioning against confusing subject matter jurisdiction with the merits of a claim); cf. Rocovich, 933 F.2d at 993 ("In determining whether a motion to dismiss should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed."). As Justice Scalia explained in Tenet, the Totten bar implicates the court's subject matter jurisdiction, see Tenet, 544 U.S. at 12 (Scalia, J., concurring), and therefore must be addressed before the court may consider a "nonthreshold *merits* question whether a cause of action exists," id. Moreover, the court is guided by Justice Ginsburg's reminder that Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh, 546 U.S. at 514 (explaining that, "when a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety").

alleged to have been [deleted] and the meetings alleged to have been conducted in secret, there is no allegation that the contract was secret or that the services . . . implicated in any way issues of state secret." Id. at 3 n.2. Plaintiff states that it would be "inappropriate to simply assume that the alleged 'support and assistance' necessarily involve[] matters of state secret." Id. at 4.

Plaintiff misses the point of Totten. The "secret" at issue in a Totten analysis is not the terms of the alleged contract. Rather, the Totten bar seeks to shield the fact of the alleged relationship between the putative plaintiff and the Government. See Tenet, 544 U.S. at 8 ("Totten precludes judicial review in cases such as respondents' where success depends upon the existence of their secret espionage relationship with the Government."). While plaintiff's complaint and subsequent briefs do not state expressly that espionage was involved, the facts as alleged plainly indicate that is precisely what plaintiff was asked to do and claims to have done. First, plaintiff claims to have contracted with [deleted] in Iraq. Plaintiff likely is correct that not "every agreement involving a [deleted]" implicates the Totten bar. Pl.'s Br. filed Sept. 28, 2010, at 2 n.2. However plaintiff overlooks other pertinent facts surrounding his alleged contacts with [deleted] or other [deleted] demonstrating that Totten is on all fours with this case.

Plaintiff's complaint states that he reached an agreement with "authorized representatives of the United States . . . prior to the initiation of Operation Iraqi Freedom and requested that [he] provide assistance in support of its mission in Iraq." Am. Compl. ¶ 4 (emphasis added). Prior to Operation Iraqi Freedom, Iraq was ruled by the spectacularly predatory dictator Saddam Hussein and his malevolent sons. Plaintiff alleges that the [deleted] asked for his "assistance in support of its mission in Iraq." Id. Yet, the "mission in Iraq" involved deposing the Hussein regime—plaintiff was asked to commit treason against the Iraqi government by assisting that government's enemies to prepare for war against it. See Am. Compl. ¶ 4 ("The United States agreed that, in exchange for this support and assistance, it would compensate [p]laintiff . . . in the forthcoming military action." (emphasis added)). The idea that, during this time, an Iraqi citizen who was a "prosperous, well-educated and influential man," id., who possessed a "unique status," id., in his community would be openly approached by agents of the United States is preposterous.

Whether plaintiff characterizes these activities as espionage, they involved the kind of clandestine activities to which the Totten bar is intended to apply. See Totten, 92 U.S. at 106 ("The service stipulated by the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. . . . This condition of the engagement was implied from the nature of the employment, and is implied in all secret employments of the government in time of war . . . .").

Other facts alleged by plaintiff demonstrate that the contract was for clandestine activities. Prior to the invasion, [deleted] provided plaintiff with a "throwaway cell phone" to use in contacting them. Pl.'s Br. filed June 21, 2010, at 28-29. A disposable phone may not be as obvious a subterfuge as Maxwell Smart's shoe phone, but the intent of its use, to allow plaintiff to quickly dispose of any evidence of his contacts with the [deleted], seems obvious. Plaintiff describes the meetings they engaged in as "secret face-to-face meetings." Id. at 29. Plaintiff agreed to provide "information, insight, cooperation and assistance" in connection with the upcoming invasion. Id. Following the invasion, plaintiff continued to meet, in secret, with other [deleted] in Iraq, [deleted], and [deleted]. Id. at 29-30. It seems counterintuitive for [deleted] to engage in secret meetings if the meetings were held pursuant to a contract, or at least a relationship with plaintiff, that was not a secret, or to put it another way, did not involve "matters which the law itself regards as confidential." Totten, 92 U.S. at 107.

More critically, the [deleted] who allegedly contacted plaintiff used false names. See Pl.'s Br. filed June 21, 2010, at 52 ("The people who made the agreement on behalf of Defendant were [deleted] who intentionally sought to obscure their identities, capacities, authorities and bona fides."). The court agrees with defendant that further judicial proceedings, including discovery and trial, open the door to the possibility that "these surreptitious persons may be called to establish the terms of the contract." Def.'s Br. filed Sept. 27, 2010, at 5. A trial involving such a claim is fraught with the potential that confidential state matters would be made public. This is sufficient to implicate "Totten's core concern . . . preventing the existence of the plaintiff's relationship with the Government from being revealed." Tenet, 544 U.S. at 10. "The possibility that a suit may proceed and an espionage relationship may be revealed . . . is unacceptable . . . ." Id. at 11. Further, in the case at bar, the Government and plaintiff have good reason to keep secret the fact of their relationship: the potential threat to plaintiff's life that would result from its exposure. Indeed, plaintiff alleges that this exact scenario transpired when a [deleted] warned plaintiff and his [deleted] to leave Iraq because Al Qaeda was planning to murder them due to their work with the United States. See Pl.'s Br. filed June 21, 2010, at 29.

Plaintiff alternatively claims that, to the extent plaintiff's agreement with [deleted] or its terms were ever a secret, the Totten bar is waived because the Gillette Memorandum evinces the Government's voluntary election to "overtly acknowledge its relationship" with plaintiff and the terms of his compensation. Pl.'s Br. filed Sept. 28, 2010, at 4; see also supra note 26. At argument defendant countered that the Gillette Memorandum "should not be read in conjunction with any alleged contract, because [the memorandum] says you cannot object," nor does it make reference to any other contract. Tr. at 85. For the following reasons, the court agrees with defendant's assessment.

Were the court considering a motion to dismiss on the merits, the court would draw all reasonable inferences in plaintiff's favor. <u>Cary</u>, 552 F.3d at 1376. However, this leniency would not apply for unreasonable ones. The text of the Gillette Memorandum fails to reference any pre-existing contract or agreement. The only connection between the Gillette Memorandum and the oral contract alleged by plaintiff is the similar offers to "be fair and to compensate [plaintiff] for any damages and inconveniences caused by our occupation" in the Gillette Memorandum, Am. Compl. Ex. 2, and plaintiff's allegation that [deleted] offered to "compensate Plaintiff for any inconvenience or damage he sustained in the forthcoming military action," <u>id.</u> ¶ 4. Aside from this allegation, plaintiff puts forward no evidence establishing any connection between the memorandum and the alleged contract. Plaintiff's contention, in fact, is undermined by the terms of the Gillette Memorandum, which, in addition to providing that plaintiff cannot object to the occupation, states that plaintiff's home is being occupied "without your consent." <u>Id.</u> Ex. 2. This is hardly an indicum of a prior agreement.

Moreover, counsel for plaintiff's statement at oral argument dispels any inference that the court might reasonably draw showing such a connection:

> [T]his is a circumstance [i.e., the damage to plaintiff's property] which the Government could have avoided entirely had they used the communication that they had ongoing with [plaintiff] already. The brief reports that [plaintiff] was evacuated by the United States to [deleted] on the basis of [deleted], where he was seen to be a target for assassination, and they got him into [deleted] for safekeeping. Had the Americans in the same process had said, oh, by the way, my left hand just left your house, then [plaintiff] who has an ongoing relationship with the United States, in which they are talking regularly, and they are giving him money regularly, would have been in a position to avoid the effect of losing his security system. They didn't do that.

Tr. at 70-71. Were the case in a posture to take plaintiff's statements as true, the only logical inference that could be drawn is that plaintiff was not informed that the U.S. military forces left his property because they were not aware of his relationship with the [deleted]. In other words, as plaintiff states, the left hand was not telling the right hand what it was up to. The effect of plaintiff's current location only bolsters defendant's claim that plaintiff's relationship with the [deleted], if it existed, was itself a secret. Viewed in this light, no possibility exists that the Gillette Memorandum was a written confirmation of the Government's oral contract, much less a waiver of the <u>Totten</u> bar.

Based on the foregoing, the court concludes that plaintiff's alleged agreement and subsequent relationship with United States intelligence operatives were covert. <u>Totten</u> therefore divests this court of its subject matter jurisdiction over plaintiff's claim. <u>See</u> <u>Tenet</u>,

544 U.S. at 8; Totten, 92 U.S. at 107.  Nevertheless, because defendant "reiterates" its position that plaintiff failed to state a valid contract claim, see Def.'s Br. filed Sept. 27, 2010, at 4 n.2, the court next considers, only as a far-fetched assumption of relevance to disposition, the merits of plaintiff's contract claim to determine whether plaintiff has stated a cognizable claim for relief.

2.  Plaintiff's claim for breach of an express or implied contract

"In the absence of factual disputes, the question of contract formation is a question of law . . . ."  Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); see also Bay View, Inc. v. United States, 278 F.3d 1259, 1263 (Fed. Cir. 2001).  "The question of whether a contract creates a duty is also a question of law."  Trauma Serv., 104 F.3d at 1325.  "The party alleging the existence of a contract has the burden of demonstrating 'a mutual intent to contract including an offer, an acceptance, and consideration.'" Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1434 (Fed. Cir. 1998) (citation omitted).  Unlike an express contract, "[a]n agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"  Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923)).

In order to maintain a claim based on either an express or an implied-in-fact contract with the United States, plaintiff must show: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government."  Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (emphasis omitted); see also City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) ("When the United States is a party, a fourth requirement is added: the Government representative 'whose conduct is relied upon must have actual authority to bind the government in contract.'" (quoting Juda, 6 Cl. Ct. at 452)).  "Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, regardless of the agent's representations."  Doe v. United States, 100 F.3d 1576, 1584 (Fed. Cir. 1996).  The requirement of an "authorized agent of the Government" applies equally to implied-in-fact contracts with the United States as it does to an express contract.  Trauma Serv., 104 F.3d at 1326.  The Federal Circuit explained the necessity of this requirement in El Centro: "The United States Government employs over 3 million civilian employees.  Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States."  922 F.2d at 820.

1)  Actual authority

    To succeed on a contract claim against the United States, it is not sufficient for plaintiff merely to assert that he entered into a contract with the United States.  Plaintiff must plead facts sufficient to allege that the Government agent had actual authority to bind the Government to a contract.  Harbert/Lummus Agrifuels Projects, 142 F.3d at 1432.  Plaintiff's subjective belief is irrelevant.  Id.; see also Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947) ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. . . . And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.").

    To the extent that plaintiff alleges a contract claim, taking into consideration the extreme difficulties in accurately identifying the identities of the government agents with whom plaintiff alleges he contracted, the court concludes that, by alleging their first names, plaintiff has alleged with sufficient specificity their identities.  Cf. Sartori v. United States, 58 Fed. Cl. 358, 361-62 (2003) (dismissing breach of implied contract claim because plaintiffs failed to name government official who allegedly entered into implied contract and failed to allege official had actual authority to enter into contract).  Construing all inferences in the light most favorable to plaintiff, Cary, 552 F.3d at 1376, the court is satisfied, albeit at the margin, that plaintiff has named officials who offered to bind the United States to a contract for services with plaintiff for an unlimited sum.  However, plaintiff has not shown that such persons had actual authority to bind the Government, and the court cannot glean from plaintiff's amended complaint or his affidavit evidence sufficient to imply actual authority.

    "Although apparent authority will not suffice to hold the [G]overnment bound by the acts of its agents, implied actual authority, like expressed actual authority, will suffice."  H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (citations omitted); see also Doe v. United States, 100 F.3d 1576, 1585 (Fed. Cir. 1996) (affirming grant of summary judgment where party failed to allege and facts could not show that customs special agent or assistant U.S. attorney had implied actual authority to enter into contracts for informant awards).  The court may imply authority to bind the Government "when it is an integral part of the duties assigned to the particular government employee."  Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1346 (Fed. Cir. 2007); accord Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1235 (Fed. Cir. 2005); Doe, 100 F.3d at 1585; Landau, 886 F.2d at 324.

    Assuming, *arguendo*, that plaintiff can establish a contract with the [deleted], the central issue remains whether the [deleted] or other government agents identified by plaintiff

52

had "actual authority to contract in the manner [they] did." Monarch Assurance P.L.C., v. United States, 244 F.3d 1356, 1360 (Fed. Cir. 2001). The court concludes that plaintiff has failed to state a claim for either an express or implied-in-fact contract. Assuming the veracity of all facts plaintiff alleges in his amended complaint and responsive briefing, plaintiff has made no showing—beyond mere allegations—that the alleged oral contract was entered into by United States agents who possessed actual authority to contract on behalf of the United States. In order to survive a RCFC 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). The Supreme Court explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Id. (citing Twombly, 550 U.S. at 556).

Plaintiff has pleaded no facts that could lead the court reasonably to infer that these operatives had authority to bind the United States. Plaintiff protests that doing so "is no easy task," because the operatives "intentionally sought to obscure their identities, capacities, authorities and bona fides." Pl.'s Br. filed June 21, 2010, at 52. Moreover, plaintiff argues that defendant "should not be permitted to avoid agreements that are within the authority of its intelligence professionals simply because . . . a plaintiff cannot . . . plead the details of their authorities." Id. That said, neither should a plaintiff be allowed to benefit by holding him to a lesser pleading standard than every other litigant in federal court. Plaintiff's averment that the agents were "authorized representatives of the United States," Am. Compl. ¶ 4, is not sufficient for the court reasonably to infer that these agents possessed authority to bind defendant to a contract that, by its alleged terms, was for a potentially unlimited amount and duration.

### 2) Definite terms and consideration

For an alleged contract with the United States to be enforceable, the terms of the contract must be sufficiently definite, i.e., the terms must be clear enough to permit a determination of breach and remedies. Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992). "To be valid and enforceable, a contract must have both consideration to ensure mutuality of obligation, and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ace-Fed. Reporters, Inc. v. Barram, 226 F.3d 1329, 1332 (Fed. Cir. 2000) (quoting Restatement (Second) of Contracts §§ 33(2), 71, 72 (1981)), quoted in Gardiner, Kamya &

Assocs., P.C., v. Jackson, 369, F.3d 1318, 1322 (Fed. Cir. 2004); see also Aviation Contractor Emps., Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991) ("The requirement for certainty in contacts serves two purposes. One is the need to determine whether the parties in fact intended to contract at all, and the other relates to the ability of a court to determine when a breach has occurred and to formulate an appropriate remedy.").

The absence of sufficiently definite terms will defeat a claim for contractual relief. See United Pac. Ins. Co. v. Roche, 401 F.3d 1362, 1366 (Fed. Cir. 2005) ("'In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise.'" (quoting Modern Sys. Tech., 979 F.2d at 202)). E.g. Lewis v. United States, 70 F.3d 597, 601 (Fed. Cir. 1995) (explaining that indefiniteness of supposed offer under statute prevents formation of contract "even if an intent to be bound could be inferred" from statute). However, the court will not consider "after-the-fact claims of indefiniteness . . . 'where the parties knew what each of them was to do under the contract and some standard exists to measure performance.'" Clearwater Forest Indus., Inc. v. United States, 650 F.2d 233, 242 (Ct. Cl. 1981) (quoting Saul Bass & Assocs. v. United States, 505 F.2d 1386, 1394 (Ct. Cl. 1974)); see also Aviation Contractor Emps., 945 F.2d at 1572 ("[O]nce it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract.").

The court concludes that the amended complaint fails to state a claim for an express or implied-in-fact contract on the alternative ground that the complaint fails to allege facts tending to show sufficiently definite terms or the existence of consideration. Plaintiff alleges that he accepted an offer made by [deleted] that "in exchange for [plaintiff's] support and assistance, [the United States] would compensate [p]laintiff for any inconvenience or damage he sustained in the forthcoming military action." Am. Compl. ¶ 4. Vague promises of future compensation of an amount to be determined unilaterally by the United States do not constitute bargained-for consideration under the Federal Circuit's formulation in Gardiner, Kamya. See 369 F.3d at 1322.

In addition, plaintiff's allegation that the contract specified only that plaintiff would be "compensated" does not meet the pleading requirement of definite terms. Plaintiff does not specify how the Government would compensate plaintiff, or whether there was any ceiling on the amount of compensation. For example, in response to defendant's motion to dismiss, plaintiff alleges that Mr. [deleted] gave plaintiff [deleted] "to use in connection with activities conducted by Plaintiff on behalf of Defendant," Pl.'s Br. filed June 21, 2010, at 29, and that, from 2004 through 2008, the Government paid plaintiff [deleted] "in partial performance of its contract," id. at 29-30. Was any part of the [deleted] entrusted to plaintiff a payment for plaintiff's services? Did the government [deleted] who made the [deleted] payments to plaintiff consider those payments to satisfy any government obligation? As pled, the terms of the alleged contract are insufficiently definite as to whether the Government

breached its promise or, in the event the court found a breach, to fashion an adequate remedy. In short, plaintiff has not pled a contract.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  Defendant's motion to dismiss for lack of subject matter jurisdiction is granted. The Clerk of the Court shall dismiss the amended complaint without prejudice for lack of subject matter jurisdiction.

2.  By November 10, 2010, the parties shall identify by brackets any material subject to redaction before the opinion issues for publication.

No costs.

/s/ Christine O. C. Miller

_____
**Christine Odell Cook Miller**
Judge